IN RE THE MARRIAGE OF
JUDITH GAYLE LOPP AND JAMES D. LOPP, JR.

[No. 778S145. Filed July 20, 1978.]

*Grove, Miller & Lantz,* of Evansville, for appellant.

*Rice & VanStone,* of Evansville, for appellee.

PIVARNIK, J.—This case comes to us on a transfer petition from the Court of Appeals, First District. The Vanderburgh Superior Court entered a judgment, on December 22, 1975, dissolving the marriage of the parties, husband James Lopp Jr. and wife Judith Lopp. At the same time, the trial court ordered a division of the parties' property and awarded the husband permanent custody of their minor child, James Lopp III. On appeal, the judgment of the trial court was reversed. *In re Marriage of Lopp,* (1977) Ind. App., 370 N.E.2d 977. Husband James Lopp Jr. petitions this court to transfer this case and to set aside the judgment of the Court of Appeals.

The principal question for our review is whether the trial court's admission into evidence of tape recordings of wire-tapped telephone conversations mandates a reversal of this case. An examination of this question requires a close look at the sequence and context of events, surrounding the admission of these tapes, at the trial court.

The husband, James Lopp Jr., an attorney, and the wife, Judith Lopp, were married on January 9, 1971. They had one child, James Lopp III. Also, Mrs. Lopp had custody of her two children from a previous marriage.

Mr. Lopp subsequently became suspicious of his wife's activities. On September 20, 1975, Mr. Lopp attached a self-activating tape recorder to his home phone, without the knowledge of his wife. This device recorded all telephone

conversations, and the tape recordings acquired in this manner apparently confirmed Mr. Lopp's suspicions that his wife was seeing another man.

On September 22, 1975, the couple became involved in a domestic crisis and separated. On this date husband James Lopp confronted his wife Judith with tape recordings of telephone conversations allegedly between her and various other parties. Mr. Lopp took physical custody of their son, James Lopp III, on this date, and moved out of the marital home.

On September 23, 1975, Judith Lopp went to her husband's law office. Her father-in-law, James Lopp Sr., also an attorney, informed her that if she did not consent to give her husband temporary custody of their son James until this conflict was resolved, he would phone her former husband, inform him of the tapes and their contents, and she could possibly lose custody of all three of her children. Judith then signed an agreed provisional order which stated, in relevant part:

"Comes now the Husband in the above matter and files his petition for custody of parties' minor child, and comes now the wife and the parties agree as follows:
1. That the husband shall have the care, custody and control of the parties' minor child, James Daniel Lopp, III, provided, however, the Wife shall have temporary custody of said child at reasonable times.
And the Court now approves the agreement of the parties and the same is now so ORDERED.
. . . .
I have read the above order and being advised of my rights to an attorney, freely and voluntarily consent and approve said order.
/S/ Judy Lopp
Wife"

On this same date, husband James Lopp Jr. filed both a Petition for Dissolution of Marriage, and a Motion for Temporary Custody of Parties' Minor Child. This motion for temporary custody, as quoted above and signed by Judith Lopp, was approved and ordered by the trial court.

On September 29, 1975, after Judith Lopp talked to an attorney, she filed a Petition for Relief which asked for temporary custody of the parties' child, adequate support, possession of the parties' home, and an order restraining Mr. Lopp from interfering with her quiet enjoyment of the home. This petition also alleged that Mrs. Lopp had been coerced into agreeing that her husband should have custody of their child.

On September 30, 1975, after a meeting between wife, husband, his father, and her attorney, the trial court approved the substance of the September 23 agreement between the couple, along with other provisions. The pertinent part of this court-approved agreement, as ordered and certified into the record, was as follows:

> "Come now the husband by his attorney, Glenn A. Gramp, and comes now the wife by her attorney, David Kelley, and the wife's petition coming on for hearing, the parties agree as follows:
>
> 1. That the husband shall have the care, custody and control of the parties' minor child, James Daniel Lopp, III, provided however, the wife shall have the privilege of seeing and visiting the parties' minor child, one day a week from 9:00 A.M. to 5:00 P.M.
>
> . . . .
>
> This agreement is entered into freely and voluntarily without coercion or duress and with the wife being advised by her attorney, and having full knowledge of all the facts.
>
> And the court now approves the agreement of the parties and the same is now so ordered."

On October 3, 1975, Judith Lopp filed a Petition for Rehearing with the trial court, in which she asked the court for a new hearing on the issue of her son's custody. Alleging that the two previous court-approved custody agreements were not voluntarily agreed to by her, Mrs. Lopp's petition stated that:

> "[B]oth of her agreements herein were wrung from her by threats and coercion in that she was threatened with publication of several of her private phone calls which were recorded without her knowledge by her husband, she was threatened with total loss of her said child, her former

husband, James Forman, was subpoened to the hearing and she was threatened with the influence of her husband on transferring custody of her two daughters to said James Forman. Affiant further says that she has been subjected to the Lopp infallibility in the field of law and intimidated by the assertion of her husband and his father of their influence over the courts of this area. Affiant further says that she was advised by her lawyer, David O. Kelley, not to agree but at the conference she agreed to the custody in her husband which was held in her husband's office where she feared for her three children and their future as a family with her because of the coercion, intimidation and threats aforesaid."

Subsequent to this petition, the regular trial court judge relinquished jurisdiction and a special judge was named. Further motions and petitions were filed by the parties, including a motion by Mr. Lopp to dismiss his wife's Petition for Rehearing. The trial court took the entire matter under advisement.

On Novmeber 25, 1975, the trial court considered Mrs. Lopp's Petition for Rehearing, and overruled her husband's motion to dismiss it. A hearing was then held, specifically on the issue of the alleged fraud and coercion in the procurement of the provisional custody orders. During cross-examination of Mrs. Lopp, her husband's attorney asked that the tapes be admitted. The wife's attorney, Mr. Grove, objected on the basis of 18 U. S. C. § 2515 (1970). The trial judge stated that he had opposing briefs by the parties, including conflicting federal circuit opinions on the question of the admissibility of wiretaps in marital proceedings, and stated, "I'm prepared to overrule the objections to the tapes. If I'm wrong, I'll be reversed. If I rule otherwise and I'm wrong, I'd be reversed, so my best judgment is that my chances are better." There were further objections by the wife's attorney, relating to the disclosure of the names of third parties that might be involved by admitting the tapes. The court then stated, "Now, I'm just down here to try this case. Everyone in this courtroom knows who you're talking about but myself, and I'm the

one who has to decide it." Husband's attorney then cross-examined Mrs. Lopp about the contents of the tape. Her attorney made foundation objections, saying that he had not reviewed the tapes, and questioned their accuracy. The following colloquy then took place between the court and wife's attorney:

> THE COURT: Well, now, let me see where I am on this. She's testified that one of the reasons that she signed this was that she was afraid that the tapes would be made available to a former husband or something. Is that right?

> MR. GROVE: That's correct. It was her testimony, yes.

> THE COURT: And they're questioning whether or not playing those tapes was sufficient to intimidate her to get her to do it. Now, how am I going to know unless I hear the tapes: If that's going to be part of your evidence, then do I take your word for it, or am I supposed to hear the tapes? What's your position on that?

> MR. GROVE: No, may I say to the Court that we have no objection if the Court does hear the tapes under any circumstances, under the appropriate rules, as a matter of fact, either by way of in camera proceedings or anything else. I'm not sure what the state of the law is. Not that I'm questioning the Court's ruling. We don't have any objection if the Court listens to the tapes, either in in camera proceedings or anything else, to help you decide. That is not the basis. I object to the format by which they are attempting to cross-examine her as to the subject matter. And because of the many questions in my mind, if the Court wishes, out of the presence of both attorneys and parties, to listen to the tapes, I have no objection whatsoever. Except, I cannot verify . . . I can't say and I don't know that my client can say that they have not been tampered with in some way, there's no evidence.

> . . .

> THE COURT: Of course, I certainly wouldn't listen to them without the presence of both attorneys on either side. That's part of it. I personally would rather not listen to them, if I had a preference on it.

> . . .

> MR. GROVE: . . . [W]e have no objection as long as there are appropriate orders to protect the parties.

The trial court then impounded the tapes, at the conclusion of

this hearing, and took the Petition for Rehearing under advisement along with the parties' briefs on the subject.

On December 3, 1975, after listening to the tapes, the trial court overruled Mrs. Lopp's Petition for Rehearing and motion to overrule the provisional orders of September 23 and September 30.

The final hearing on this case was opened before the trial judge on December 10, 1975. The court ordered all of the testimony and evidence from the prior hearing, which was already before the court, to be incorporated into the present hearing. During the testimony, the husband's attorney offered the tapes into evidence. The wife's attorney objected on the grounds previously raised. The trial court then admitted the tapes, marked as Petitioner's Exhibit #8, into evidence. This ruling was made on the basis of the court's two previous rulings of admissibility of the tapes, both at the former hearing and the ruling on the incorporation of all the former hearing evidence in the present hearing. The tapes were never read or transcribed into the record. Nor did the trial court hear the tapes again. Rather, they were admitted because the judge had already heard them, and so that they could be marked for reference purposes during witness testimony. The final hearing then proceeded, at which an exhaustive amount of evidence was admitted concerning the relationship of these parties, their finances and property, and their fitness for custody, including evidence of events as described in *In re Marriage of (Forman) Lopp*, (1977) Ind. App., 362 N.E.2d 492, a case dealing with a custody modification petition from Mrs. Lopp's former divorce decree.

On December 22, 1975, the trial court issued its judgment and findings, dissolving the marriage of the parties and dividing their assets. Custody of the parties' minor son, James Lopp III, was granted to the husband, with provisions for visitation granted to Mrs. Lopp.

A Motion to Correct Errors was filed by Mrs. Lopp on February 20, 1976. Specifications nos. 6 and 9 of this motion

alleged error in the admission of the tape recordings. The trial court overruled this motion on March 3, 1976, which judgment stated as follows:

"This cause comes before the Court on the Motion to Correct errors of the Respondent and Cross-Petitioner filed on February 20, 1976, and now the Court having considered said motion,

"FINDS that the error, if any, in the admission into evidence of the matters complained of in specifications 6 and 9 of the Respondent and Cross-Petitioner's said motion constituted at most harmless error under the provisions of Trial Rule 61 of the Indiana Rules of Civil Procedure inasmuch as the evidence was merely cumulative and did not affect the substantial rights of the parties.

"And now the Court having reviewed the evidence concludes that the decision and judgment of the Court on all issues is sustained by substantial evidence even to the exclusion of the evidence complained of in specifications 6 and 9 of Respondent and Cross-Petitioner's Motion to Correct Errors, and the Court hereby reaffirms the judgment entered in this cause on the 22nd day of December, 1975.

"IT IS THEREFORE, ordered, adjudged and decreed by the Court that the Respondent and Cross-Petitioner's Motion to Correct Errors is overruled."

In the Court of Appeals opinion in this case, it was held that the trial court abused its discretion and committed reversible error by its admission into evidence of the tape recordings of the wife's telephone conversations. It was held specifically that the husband's conduct in placing the wiretap was proscribed conduct within the meaning of federal wiretap laws, 18 U. S. C. § 2510 *et. seq.* (1970), and that the exclusionary rule of such statute thus applied. *Lopp, supra,* 370 N.E.2d at 981. As against the husband's argument that the admission was harmless error, the Court of Appeals stated that the fruits of an illegal search are not admissible and that the trial court has no discretion to exercise in the admission of illegally obtained wiretap information. *Id.* at 982. The Court of Appeals also discussed the right to privacy, and as another rationale for its decision stated:

"We hold that a spouse may not obtain evidence through an illegal wiretap, wield that evidence as a sword in a domestic relation action, and then hide behind that same marital status to justify the use of his illegally obtained evidence."

*Id.* at 981. Thus, the opinion seems to have been based not only on the court's reading of the federal statutes, but also on public policy grounds. The case was then reversed and remanded for new determinations of the custody and property settlement issues, which issues were raised but not decided by the Court of Appeals in view of its disposition of the wiretap issue. Other evidentiary issues in this case were decided by the Court of Appeals, however, including a specific finding against the wife on her claim that the trial court's provisional orders were obtained under duress and fraud. The Court of Appeals found that the evidence was sufficient to sustain the trial court on this point. *Id.* at 983.

The husband's transfer petition to this court alleges several errors in the above opinion of the Court of Appeals. Chiefly, he argues that the federal wiretap statutes are not applicable to this case, and also reasserts his harmless error and cumulative evidence arguments. Contrary to the Court of Appeals' allusions to the wife's right of privacy, he argues that the Court of Appeals decision violates *his* right of privacy in his own home. He also, in his brief, says that the Court of Appeals could not have ruled on the cumulativeness of the tapes unless they "gazed into a crystal ball," since they did not say that they heard the tapes. Against this argument, the wife argues here that it is "beyond the realm of possibility" that the trial court was not prejudiced by listening to the tapes. We are thus faced with more than a few incredible arguments and novel constitutional questions, concerning the construction of a federal statute, federalism, and rights of privacy, the upshot of which has been attempts, on both sides since the beginning of this case, to goad a trial court judge into error in a dissolution proceeding by reference to a mysterious evidentiary quantity about which the law is totally uncertain.

While we do not endorse all the claims of the husband, or his conduct, we grant transfer and reverse the opinion of the Court of Appeals, insofar as it held that the trial court's action mandates reversal of this case. Our holding is strictly limited to the particular facts and circumstances surrounding the admissibility of these tapes in this trial, as outlined above and discussed subsequently. In essence, we do not see how any more evidentiary hearings can further either justice to these parties or the best interest of their child, in view of the substantial evidence already heard. We hold that the trial judge ruled prudently concerning the tapes, and acceed to his judgment on disputed questions of fact. Also, we believe that the Court of Appeals, in relation to these facts and circumstances, fashioned an evidentiary policy which actually support the trial judge's conduct.

The center of the legal controversy here is the applicability of the federal wiretap statutes, 18 U. S. C. § 2510 *et seq.* (1970) to the present dissolution of marriage proceeding. Section 2511 of the statute is a criminal sanction against any person who wilfully intercepts, uses, or discloses illegal wiretaps and illegal oral communication interceptions. Section 2515 of the statute, which is the part chiefly in issue here, is an exclusionary rule relating to such evidence which states as follows:

> "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."

Another part of the statute, § 2520, provides for recovery of civil damages by those who have been illegally wiretapped against those who have so violated their privacy. The legislative history of these statutes states that Congressional power

in this area is founded on the power to regulate interstate commerce, and that the sanctions in the act are designed to protect privacy. *See* 1968 U.S. Code Cong. & Admin. News 2177-97. This history also states that the exclusionary rule of § 2515 was meant to apply in both federal and state proceedings, and is not meant to be limited to criminal proceedings. *Id.* at 2185. There have been no comparable statutes on wiretap activities passed by the legislature of this state.

Several courts have considered whether or not, as a matter of statutory construction and legislative intent, these federal statutes apply to electronic surveillance between married persons. The most celebrated cases on this question are *Simpson* v. *Simpson,* (5th Cir. 1974) 490 F.2d 803, *cert. denied,* (1974) 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141, and *United States* v. *Jones,* (6th Cir. 1976) 542 F.2d 661. *Simpson* was a suit for civil damages, by a wife who was wiretapped by her husband, which held that these statutes did not apply to interspousal wiretapping. *Jones* reached the opposite conclusion, in a federal criminal prosecution against a husband who intercepted telephone communications of his wife, from whom he was then separated. The United States Supreme Court has not spoken directly to this question, and the division of opinion is reflected in other federal cases. *See Anonymous* v. *Anonymous,* (2d Cir. 1977) 558 F.2d 677, *aff'g London* v. *London,* (S.D.N.Y. 1976) 420 F.Supp. 944 (dismissing a civil suit by wife against husband who had wiretapped her) ; *United States* v. *Schrimsher,* (5th Cir. 1974) 493 F.2d 848 (upholding a criminal prosecution of a man who wiretapped his former lover) ; *Remington* v. *Remington,* (E.D.Pa. 1975) 393 F.Supp. 898 (denying motion to dismiss civil suit brought by husband who had been wiretapped by his wife and others).

On the precise question of the applicability of § 2515, the exclusionary rule of the federal wiretap statutes, there is a similar dearth of authority and division of opinion. In *Beaber* v. *Beaber,* (C.P. Stark Co. 1974) 41 Ohio Misc. 95, 322 N.E.2d 910, a trial judge held that neither the federal wiretap statutes

nor the right of privacy under the United States Constitution prevented him from listening to a husband's wiretapping of a wife's telephone conversations in the marital home. The court reasoned, in this divorce proceeding wherein child custody was in issue, that he was only listening to the tapes for impeachment purposes. On the basis of other evidence before him, the judge thought that the husband was in an "indefensible position" without the tapes, since the husband's testimony alone seemed "almost unbelievable" until the tapes were admitted, which tapes vindicated him and "completely obliterated" the otherwise believable testimony of his wife. *Id.*, 41 Ohio Misc. at 97, 103, 322 N.E.2d at 912, 915. The trial judge's opinion was affirmed in an unpublished opinion by the Ohio Court of Appeals, *Beaber* v. *Beaber*, No. 4187 (Ohio App., 5th Dist., Aug. 4, 1975). The Ohio Court of Appeals also saw the question as one of admitting the wiretaps solely for purposes of impeachment, upon the issue of witness credibility relative to alleged perjury in fraudulently obtaining a court order, rather than as a question of using such wiretaps as substantive proof in the case, absent perjury. *Id.*, slip op. at 14-15. The court concluded, after recognizing the federal line of authority that otherwise unconstitutional evidence can be used for impeachment purposes, that:

> "The law has justice not injustice as its purpose. Justice not injustice is the end sought by the United States Constitution, the Constitution of the State of Ohio, and by the laws of the United States, of the State of Ohio, and the Courts. Although under some other circumstances the tapes might be constitutionally inadmissible or their admission might be prohibited by statute, under the facts of the instant case there can be no justification for permitting the plaintiff to turn the method by which the tapes were obtained to her own advantage, and thus provide herself with a shield against contradiction of her own untruths."

*Id.*, slip op. at 17-18. Although the *Beaber* courts discussed issues similar to the question of the applicability of 18 U. S. C. § 2515, unfortunately, that exclusionary rule section of the federal wiretap statute was not cited or discussed in their

opinions. Section 2515 was cited and discussed briefly by the Florida courts in *Markham* v. *Markham*, (Fla. App. 1972) 265 So.2d 59, *aff'd*, (Fla. 1973) 272 So.2d 813. This case was a dissolution of marriage action, in which the husband offered wiretaps of telephone conversations of his wife on the issue of temporary custody of the children. The trial court did not think that the federal statutes necessitated an exclusion of this evidence, but this decision was held reversible at both levels of state appellate review. It was agreed that the general right of privacy of persons was a matter of state, not federal, law. *Id.*, (Fla. App.) 265 So.2d at 60-61. However, it was found that both the Florida Constitution and the applicable statutes of Florida prohibited the use of such evidence as a matter of state law. *Id.*, (Fla. App.) 265 So.2d at 61-62; (Fla.) 272 So.2d at 814. The same result was reached in the North Carolina case of *Rickenbaker* v. *Rickenbaker*, (1976) 28 N.C. App. 644, 222 S.E.2d 463, *aff'd*, (1976) 290 N.C. 373, 226 S.E.2d 347. In this case, a husband who was no longer living in the marital home wiretapped his wife, who was still living there, and attempted to admit such evidence in a divorce action where child custody was in issue. The state appellate courts both construed § 2515, holding that it clearly prohibited the use of wiretapping in evidence, in the case at hand, and that this federal law was binding on state judges. *Id.*, 28 N.C. App. at 647-48, 222 S.E.2d at 465; 290 N.C. at 381-82, 226 S.E.2d at 352-53. In our own state, the first time that § 2515 has ever come into question is in the present case, and the only opinion on it is that of the Indiana Court of Appeals here under review.

A review of all the above authority leads to two conclusions pertinent to the case before us. First, the precise question which we face has not yet been decided by any other court. That question, as we see it, is whether or not wiretapped telephone conversations are admissible in a marital action wherein it is claimed that they have been used to coerce or blackmail a party into a court-approved

agreement, thereby also defrauding the court. This is thus a different question, of statutory interpretation and legislative intent, from the more general question of whether § 2515 can be construed to mandate exclusion of wiretaps as substantive proof on the merits of the controversy. Seen in this light, the present question is most analogous to that faced by the Ohio courts in *Beaber, supra,* wherein it was only decided whether the tapes could be used for impeachment purposes as to alleged perjury in attempting to obtain a court order. Our second conclusion, drawn from the authorities, is that questions of federalism are necessarily involved in any application of § 2515 to marital actions. This is because both the clear language and legislative history of the statute arguably foreclose *any* exceptions to its rule, as a matter of statutory interpretation. As phrased in *Anonymous, supra,* 558 F.2d at 677, "The issue becomes at what point interspousal wiretaps leave the province of mere marital disputes, a matter left to the states, and rise to the level of criminal conduct prescribed by the federal wiretap statutes." The issue was also seen in this light by Circuit Judge Bell, now the United States Attorney General, in *Simpson, supra,* 490 F.2d at 805, though he purportedly resolved this underlying question of federalism as a matter of statutory interpretation.

On the question of statutory interpretation before this court, we find that § 2515 would lead to an illogical and absurd result if read to mandate reversal of the present case. The record is clear that the tapes were listened to by the trial court for the purpose of deciding the question of fraud and coercion in the procurement of the provisional custody orders of September 23 and September 30. This question of fraud and coercion was brought forward by Mrs. Lopp, after she had signed the orders, and the first hearing in this case was specifically had on that issue. Thus, at the time the trial court had to decide the fraud question, he had two contradictory representations of Mrs. Lopp herself: her signature on the provisional custody agreement, with

the statement there that she had advisedly and freely and voluntarily entered into it, and her present claim and testimony that her will had been overborne by fraud and coercion tantamount to blackmail. The claim of fraud and coercion was based on the existence of the tapes of Mrs. Lopp's phone conversations, which evidence the trial court correctly observed that he had only the representations of the attorneys about. Mrs. Lopp did not object to the trial court hearing the tapes for this purpose. The trial court then heard the tapes, which were never transcribed into the record. We doubt that Mrs. Lopp would still be objecting to the admission of the tapes, had the trial court in fact found that their subject matter was such as could have overborne her will.

The Court of Appeals has stated in this case that a spouse should not be able to wield illegal wiretaps "as a sword in a domestic relation action," and then be able to hide behind the marital status that he has wielded the sword against to justify the admission of such evidence. *Lopp, supra,* 370 N.E.2d at 981. However, if this statement is either correct as an interpretation of the federal wiretap statutes, or laudatory as an expression of state judicial policy, it actually supports the action of the trial judge in this case. He specifically heard the tapes because of allegations that the husband had improperly wielded this evidence in order to gain the wife's assent to custody orders. The trial judge was thus actually trying to prevent the kind of overreaching about which the Court of Appeals is concerned. An exclusionary rule, which would prevent the hearing of the tapes even for this purpose, would not necessarily prevent the use of wiretapped private phone conversations for blackmail. Even if the tapes are inadmissible as evidence in a courtroom, they could be used in other ways that might coerce a person into signing a court agreement. In the present case, for instance, Mrs. Lopp was purportedly afraid that her former husband would have access to the tapes. If the tapes were thus inadmissible for purposes of showing the substance of such

fraud and coercion, the person they were used against would be left without anything, other than his own testimony, with which to evidence the coercion before the court. It is unfortunate that electronic surveillance equipment can be used for such purposes generally in society, but as long as this equipment is in existence a blanket evidentiary exclusionary rule cannot prevent all possible abuse. On the other hand, if the type of blackmail alleged here is to be guarded against when court orders relating to custody are at stake, the tapes must be admissible to evidence such fraud. Otherwise, the trial judge would have only the representations of the parties and their attorneys on which to base a decision. In such event, a spouse could claim coercion and defraud the judge by merely wielding harmless, or even blank tapes, which the judge could not hear. It is a well established principle of statutory interpretation that if a statute is open to two interpretations, the presumption is that the legislature intended the more reasonable of the two, for the legislature cannot be presumed to have expected that a statute be applied in an illogical and absurd manner. *See, e.g., Kerlin's Lessee* v. *Bull,* (1786) 1 U.S. (1 Dall.) 175, 1 L.Ed. 88; *Pryor* v. *State,* (1973) 260 Ind. 408, 296 N.E.2d 125; *In re Adoption of Jackson,* (1972) 257 Ind. 588, 277 N.E.2d 162. Even if we ascribe to the national Congress, in the enactment of § 2515 and other federal wiretap statutes, a legislative purpose of preventing wiretap abuse in domestic relations matters, *see Jones, supra,* 542 F.2d at 668-71, that purpose is in fact hindered by the application of § 2515 to mandate reversal of this case. Thus in view of all the facts and circumstances herein, we hold the action of the trial judge in this case to be proper, and not reversible error. We believe that the other interpretation urged by Mrs. Lopp on appeal, leads to an illogical and absurd result which we presume that the national Congress did not intend.

Underlying the decision we reach is a consideration of due process. Certainly, it is essential in custody determination

that agreements between parties before the court, given the trial judge's approval and entered as his orders, be freely agreed to as expressions of the parties' intent, and not be the product of fraud and blackmail. Our trial rules provide for relief from court orders and judgments on the basis of "fraud, misrepresentation, or other misconduct of an adverse party." Ind. R. Tr. P. 60(B)(3). As stated by the Ohio Court of Appeals, the end sought by both state and federal constitutions and statutes is justice, not injustice. *Beaber*, (Ohio App.) *supra*, slip op. at 17-18. *See also* U.S. Const. amend.V, amend. XIV: Ind. Const. art 1, § 12. Further, the type of order involved here, of child custody, is a special concern of the trial judge apart from the interests, selfish or otherwise, of either the husband or wife in a dissolution proceeding. The trial judge has the responsibility to assure that such orders are entered in accordance with the best interests of the child. Ind. Code § 31-1-11.5-21 (Burns Supp. 1975) ; *Schwartz* v. *Schwartz*, (1976) 170 Ind. App., 351 N.E.2d 900, 901. It cannot be seriously claimed that a fraudulently procured custody order, if such were in fact the case, furthers either the best interest of the child or an orderly process for a determination of what that interest is. We thus, in the present situation, feel that to the extent § 2515 can be read to the contrary, it would be an unconstitutional impairment of an integral and essential function of state court judges, the entering of efficacious orders, free of fraud, which function here is related to a service traditionally performed by state judges and expected of them by their legislatures and citizens, the providing for the best interests of the children in domestic relations disputes. *See National League of Cities* v. *Usery*, (1976) 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245, construing U.S. Const. amend. X. We seriously doubt, however that the national Congress intended such an interpretation and application of § 2515. Since another part of the federal wiretap statute, § 2520, provides for civil damages for persons aggrieved by electronic surveillance, the federal

courts in such a case would presumably be compelled to listen to the wiretaps, to prove their existence, as an essential element of the case. That function is directly analogous to the purpose for which the trial judge listened to the tapes in this case.

We also do not agree that the trial judge's later admission of the tapes at the final hearing mandates reversal of this case. At the time of the final hearing, the tapes had already been admitted for a proper purpose, and for a purpose which Mrs. Lopp did not object to. The trial judge had already listened to them, and it was not suggested by anyone that he disqualify himself from the case for this reason. It is clear that the tapes were only readmitted as part of a general order to incorporate all evidence already before the court into the final hearing, and for purposes of marking them as an exhibit in the case. The trial judge did not listen to the tapes again, nor were they read or transcribed into the record. Finally, the trial judge made two specific findings of fact on this question: that the tapes were merely cumulative and did not affect the substantial rights of the parties, thus constituting harmless error under Ind. R. Tr. P. 61, and that the final judgment on all issues was sustained by substantial evidence even to the exclusion of the tapes. In addition to these findings, the trial judge had previously found against the wife on her claim of fraud and coercion, toward which claim the substance of the tapes was supposedly probative. The Court of Appeals in this case has specifically affirmed the trial court on this finding of fact. *Lopp, supra,* 370 N.E.2d at 983. This holding of the Court of Appeals is consistent with the principle that in reviewing actions of a trial court, we neither weigh the evidence nor determine the credibility of witnesses. *B & T Distributors, Inc.* v. *Riehle,* (1977) 266 Ind. 646, 366 N.E.2d 178, 180; *Lake County Council* v. *Arredondo,* (1977) 266 Ind. 318, 363 N.E.2d 218, 219.

Thus, we do not here decide the question of the applicability

of 18 U. S. C. § 2515 (1970), to the use of wiretap evidence on the substantive merits of the child custody question, ▮▮▮▮ because it is apparent that this question is not properly before us in this case. In the final analysis, this court must be the judge of its constitutional jurisdiction, and this jurisdiction, as embodied in the Constitution of Indiana by the people themselves acting in a sovereign capacity, is entitled to strict construction. *Warren* v. *Indiana Telephone Co.*, (1940) 217 Ind. 93, 26 N.E.2d 399, *construing* Ind. Const. art. 7. Whatever the resolution of the question concerning the general scope of § 2515, we do note that the harmless error doctrine has been applied to the admission of illegal wiretap evidence in the case of *United States* v. *Quintana,* (7th Cir. 1975) 508 F.2d 867. There, the court stated that wiretaps, in violation of the same federal statutory scheme that is in issue in this action, were "merely cumulative to the great weight of other evidence" and "did not affect the substantial rights of the parties." *Id.*, at 873. Their admission was thus harmless beyond a reasonable doubt under the concept of *Chapman* v. *California,* (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. The same assessment was made by the trial judge in this proceeding, and we decline to engage in any presumptions concerning that judge's bias or prejudice based solely on the fact that he heard the tapes. The harm arising from evidentiary error is lessened substantially when the trial is by the court sitting without a jury. *See generally Shira* v. *State,* (1918) 187 Ind. 441, 119 N.E. 833; *King* v. *State,* (1973) 155 Ind. App. 361, 292 N.E.2d 843. Without a transcription of these tapes before us to demonstrate their supposed prejudice, the presumptions in favor of the trial court's judgment apply in full force, and we must agree, in light of all the circumstances of this case, that the error, if any, in his hearing of the tapes was harmless beyond a reasonable doubt.

Four other questions need to be discussed here. Because of its disposition of this case on the issue of wiretap admis-

sion, the Court of Appeals did not reach two other arguments of Mrs. Lopp, alleging abuse of discretion in both the trial court's grant of permanent custody and its division of marital property. To a great extent, these arguments depend on the assumption that the trial court was unduly prejudiced by listening to the tapes, which assumption we have rejected. The remainder of these arguments, assentially, are a reargument of the conflicting evidence in this case and the relative weight to be accorded it. We have reviewed these arguments, and find that the evidence, while conflicting, is of enough substance to support the judgment of the trial court on the questions of custody and property division. We also agree with the Court of Appeals' disposition of the two other evidentiary issues in this case: that the admission of a deposition of wife's paramour was erroneous, but harmless since the deposition was merely cumulative, and; that there is sufficient evidence to support the trial court's finding on the issue of the wife's voluntary assent to the provisional custody orders. *Lopp, supra,* 370 N.E.2d at 982-83. We fail to see how any further evidentiary hearings in this matter could lead to other results, or be in the best interest of the parties' minor child.

Transfer is granted, and the decision of the Court of Appeals in this case is vacated. The judgment of the trial court is affirmed in all respects.

Givan, C.J., Hunter, Prentice, JJ., concur; DeBruler, J., dissents.

NOTE.—Reported at 378 N.E.2d 414.