In re the NOMINATION OF Raymond J. PARKER, Jr., to the Office of Mayor of the City of Jeffersonville, Indiana.

Ida L. CALLAHAN Appellant–Petitioner,

v.

Raymond J. PARKER, Jr. Appellee–Respondent.

No. 10A05–9107–CV–232.

Court of Appeals of Indiana, Fifth District.

Nov. 14, 1991.

Stephen W. Voelker, Jeffersonville, for appellant-petitioner.

Michael A. Gillenwater, Jeffersonville, for appellee-respondent.

SHARPNACK, Judge.

This case presents the issue of whether Raymond Parker, who has been elected to the office of mayor of Jeffersonville, was eligible to be nominated as the candidate for that office by the Democrat party in the primary election. His status was challenged following the primary by Ida Callahan who voted in the Republican primary by which Dale Orem was selected to be the Republican candidate for mayor. Ida Callahan initiated this action in the Clark Circuit Court by filing her petition contesting Raymond Parker's nomination. Following an evidentiary hearing, the circuit court found that Parker met the qualifications to be a candidate for mayor. The court accordingly entered its judgment denying Callahan's challenge. Callahan appeals, and we affirm.

Callahan raises four issues for review. She admits that one issue is moot, so we address only the following three issues:

1. Must a candidate for the office of mayor of a second or third class city reside within the city for one year before the date of the nominating primary?

2. Was the circuit court's finding that Parker resided in Jeffersonville for one year before the election supported by sufficient evidence?

3. Did the circuit court abuse its discretion in refusing to grant Callahan's request for attorney's fees?

The following are the facts most favorable to the judgment of the circuit court. Raymond Parker was born in Jeffersonville and has lived in the city for most of his life. He has served as a Jeffersonville police officer, Clark County sheriff, and Clark County treasurer. In 1987, Parker moved to an unincorporated area near Marysville, where he had constructed a large house for his family, which consisted of his wife and a stepchild. After living in the house for three years, Parker put it up for sale in January of 1990. Although Parker has taken reasonable steps to sell the house, he has not been able to sell it because of its unusually large size and configuration. His wife and stepchild continue to live in the Marysville house because the family does not want to leave the property unattended while they attempt to sell it.

Sometime in August or September of 1990, Parker began staying in an apartment in Jeffersonville. He slept in the Jeffersonville apartment for the majority of each week, although he spent some nights in the Marysville home where his wife and stepchild were living. Parker intended to make the Jeffersonville apartment his permanent residence.

When Parker moved back to Jeffersonville, he was forced to resign from the board of the Clark County Rural Electric Membership Corp. and two subsidiaries because, as a resident of Jeffersonville, he no longer resided in the area served by the REMC and its subsidiaries. As a result of his resignation, Parker gave up his rights to substantial compensation and benefits.

Since moving back to Jeffersonville, Parker has undertaken a number of steps which indicate his intention to permanently reside in the community. He has purchased land in Jeffersonville upon which he intends to construct a new house. He has registered to vote and voted without chal-

lenge in Jeffersonville, and he lists Jeffersonville as his home on both his federal and state income tax returns. In addition, Parker maintains a Jeffersonville mailing address, he attends church in Jeffersonville five to six times per week, and both his driver's license and car registration list the Jeffersonville address as his home address.

Parker filed his declaration for candidacy for the office of mayor on January 30, 1991. Parker was named the Democratic nominee after he garnered more votes than any other single candidate, including incumbent mayor Republican Dale Orem, in the primary held on May 7, 1991. Callahan then filed her petition challenging Parker's residency.

▆ Callahan first argues that the circuit court erred in determining that our law required Parker to have resided in Jeffersonville for one year prior only to the municipal election, and not the primary election, in order to qualify as a candidate for the office of mayor. After reviewing the relevant statutes and case law, we find the circuit court correctly interpreted the law.

The specific issue is the meaning of the phrase "before the election" as used in I.C. § 3–8–1–26, which provides that: "A candidate for the office of mayor of a second or third class city must have resided in the city for at least one (1) year before the election." Callahan contends that the phrase means before both the primary and municipal elections and therefore Parker must have been a resident of the city for a period of one year prior to the primary to qualify for election as the nominee for the Democrat party. Parker contends that the phrase "before the election" means only before the municipal election and that the fact that his residence period prior to the primary was only some eight months did not disqualify him. We hold that the phrase "before the election" in I.C. § 3–8–1–26 means "before the municipal election."

Callahan argues that the term "the election" refers to both primary and general or municipal elections because the election code specifically states that it applies to both types of elections. In support of this argument, Callahan places great reliance on I.C. § 3–5–1–1 and I.C. § 3–5–1–2.

▆ Although I.C. §§ 3–5–1–1 and 2 generally describe the types of elections which Title 3 governs, the term "the election" is not itself defined in Title 3. Our task is to determine what the legislature intended the term to mean with regard to I.C. § 3–8–1–26. *B & M Coal Corp. v. United Mine Workers* (1986), Ind., 501 N.E.2d 401, 403 *cert. denied sub nom. Spencer County Clerk v. United Mine Workers* (1987), 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 839. In seeking out the legislative intent, we look to "binding precedent from this state, persuasive authority from other jurisdictions, and the rules of construction which long have guided our interpretation of legislative enactments." *Hamilton County v. Smith* (1991), Ind.App., 567 N.E.2d 165, 169. We first look to the text of the entire title for whatever guidance we might find there.

The first of the sections upon which Callahan relies, I.C. § 3–5–1–1, provides that Title 3 applies to each election at which the electorate of the state or a political subdivision "nominates or chooses by ballot public officials." The next section, I.C. § 3–5–1–2, provides:

The types of elections to which this title applies are classified as follows:

(1) General election, which is conducted statewide on the first Tuesday after the first Monday in November of each even-numbered year.

(2) Municipal election, in which the electorate of a municipality chooses by ballot public officials for the municipality or decides a public question lawfully submitted to the electorate of the municipality.

(3) Primary election, which is conducted for the purpose of choosing by ballot the following:

(A) The candidates who will be the nominees of a political party for elected offices in a general election.

(B) The precinct committeemen of a political party.

(C) The delegates to a political party's state convention.

(4) School election, in which the electorate of a school district chooses by ballot members of the school board.

(5) Special election, which is conducted for a special purpose as provided by law.

Such classification does not compel the construction that the use of the term "the election" without modification elsewhere in the title means all five categories of election or any particular combination of categories. Rather, it suggests that the term "the election" when used elsewhere in the title will refer to the category of election that is apparent from the context in which the term is used.

The section which states the residency requirement, I.C. § 3–8–1–26, is part of Chapter 1 of Article 8 of Title 3 of the Indiana Code. That chapter specifies the residency qualifications for candidates for state and local offices. Included are the offices of lieutenant governor (§ 3–8–1–9), attorney general (§ 3–8–1–10), superintendent of public instruction (§ 3–8–1–10.5), and clerk of the supreme court (§ 3–8–1–11.5). The candidates for each of those offices must have resided in the state for a specified period "before the election". The same phrase, "before the election", is used to specify the period of residence in the particular place required of candidates for state senator (§ 3–8–1–13), state representative (§ 3–8–1–14), county officers (auditor, recorder, treasurer, sheriff, coroner, and surveyor) (§ 3–8–1–20), county commissioner (§ 3–8–1–21), county council member (§ 3–8–1–22), county assessor (§ 3–8–1–23), mayor of second or third class city (§ 3–8–1–26), common council member (§ 3–8–1–27), city clerk or city clerk-treasurer (§ 3–8–1–28) and school board office (§ 3–8–1–24).

The candidates for lieutenant governor, attorney general, superintendent of public instruction, and clerk of the supreme court are not nominated by primary election, but are nominated by party convention, I.C. § 3–8–4–2. The candidates for the other state and local offices indicated above are nominated by primary election. The phrase "before the election" with reference to the offices of lieutenant governor, attorney general, superintendent of public instruction, and clerk of the supreme court cannot sensibly mean before both the primary and general elections and there is no logical reason to read the phrase any more broadly with regard to the specified state and local offices.

In addition, the grammatical construction of I.C. § 3–8–1–26 supports our holding. When the meaning of a particular phrase is in doubt, we examine its structure in order to ascertain its meaning. *Foremost Life Insurance Co. v. Department of Insurance* (1980), 274 Ind. 181, 186, 409 N.E.2d 1092, 1096; *Smith*, 567 N.E.2d at 169. Here, I.C. § 3–8–1–26 refers to "*the* election." The word "the" has been defined as:

An article which particularizes the subject spoken of. In construing [a] statute, [the] definite article "the" particularizes the subject which it precedes and is a word of limitation as opposed to [the] indefinite or generalizing force [of the articles] "a" or "an".

Black's Law Dictionary 1477 (6th ed. 1990) (*citing Brooks v. Zabka* (1969), 168 Colo. 265, 450 P.2d 653, 655). Thus, by using the word "the" instead of "a" or "an", the legislature limited "election" to a single election, and not any of a set of elections as Callahan argues.[1]

■ Our interpretation of the statute is reinforced by our conviction that interpreting "election" to include primaries would lead to absurd and inequitable results. When we construe a statute, we presume that the legislature did not intend absurd results, and we accordingly construe statutes to avoid absurdities. *In re Marriage of Lopp* (1978), 268 Ind. 690, 706, 378

1. In addition, the legislature used the singular term "election" instead of the plural "elections". Had the legislature intended to include both general or municipal and primary elections, we believe that it would have chosen to use the plural, or, as it did in other sections of Title 3, the terms "primary election" and "general or municipal election" in concert. *See, e.g.,* I.C. § 3–8–7–2, I.C. § 3–10–6–2.

N.E.2d 414, 422–423 *cert. denied* 439 U.S. 1116, 99 S.Ct. 1023, 59 L.Ed.2d 76. Candidates for office in this state need not be nominated by means of primary elections. As we noted earlier, I.C. § 3–8–1–26 requires that a candidate for mayor have resided in the city for at least one year before "the election." Chapter 6 of Title 3 provides that independent or minor party candidates for office may have their name placed on the ballot by means of a nominating petition. The petition must be "filed during the period beginning January 1 of the year in which *the election* will be held and ending at noon July 15 before *the election....*" I.C. § 3–8–6–10(b)(1) (emphasis added). If "election" throughout Title 3 includes primaries, then these candidates, who do not even run in primaries, must file their petitions by July 15 before the primary election—more than one year before the election for the office for which they are running—an obviously absurd result.

In order to avoid the absurdity, Callahan could conceivably argue that "the election" for purposes of I.C. § 3–8–1–26 includes primaries only for those who are nominated by means of primaries. If "the election" for purposes of I.C. § 3–8–1–26 includes primaries only for those candidates nominated by means of primaries, then two candidates for the same office—one nominated by primary and the other by petition—would face different residency requirements: the candidate nominated by primary would have to reside in the city for a longer period of time than the candidate nominated by petition. Such a result would be absurd and would raise concern that the statute violates constitutional guarantees of equal protection of the laws. The statutory scheme is rendered rational and equitable only if the term "the election", as used in Title 3, is construed to exclude the primary election.

Callahan argues that interpretation of the term "the election" to mean only the municipal election produces an absurdity when applied to the statute providing the residence requirements for common council and, thus, cannot be correct. The statute,

I.C. § 3–8–1–27, provides that a candidate must:

(1) have resided in the city for at least one (1) year; and

(2) have resided in the district in which seeking election, if applicable, for at least six (6) months; before the election.

She asserts that since 183 days intervene between the primary and municipal elections (a fact that she argues should be judicially noticed), if "the election" is taken to mean the municipal election, then a candidate could be nominated in the primary election who did not live in the appropriate district and have three days after the primary to move into the appropriate district and qualify in time for the municipal election. Callahan continues: "The legislature must have intended for candidates to live in the area they will serve prior to the primary election. *The legislature intended 'the election' to include the primary election.* To do otherwise would be absurd and contrary to law." (Appellant's Brief, p. 19, original emphasis.)

We need not consider whether it would be absurd to allow a construction that would permit the situation posed by Callahan, because the legislature quite clearly did intend for common council candidates (and all candidates except those for judges of certain city and town courts) to reside in the district they will serve prior to the primary election. I.C. § 3–8–1–1 provides that:

(b) A person is not qualified *to run* for:

(1) a state office;

(2) a legislative office;

(3) a local office; or

(4) a school board office;

unless the person is *registered to vote* in the election district the person seeks to represent.

(emphasis added). Residency in a district is required to allow registration to vote, I.C. §§ 3–7–1–1, 2. Therefore a candidate could not run for election as a nominee to serve a district unless he was a resident of that district at the time of running and the primary election. The concern raised by Callahan is of no consequence and in no way supports the argument that "the elec-

tion" in I.C. § 3–8–1–26 means anything more than the municipal election.

Our decision also finds support in the case law of this state and other jurisdictions which have considered the issue. We have found two cases in which our supreme court has undertaken to define "election." In the first of these cases, *Martin v. Schulte* (1932), 204 Ind. 431, 182 N.E. 703, the court decided whether one of the losing candidates in the Democratic primary for the office of Representative from the first congressional district was entitled to challenge the results of that primary. In holding that the unsuccessful candidate was not entitled to contest the primary results, the court wrote:

> [The primary election law was] unknown to the common law, and nominations thereunder are in no sense an election under that law. The words "nominations" and "elections" are not synonymous, and we must not assume that the Legislature intended them to be so used.

*Martin*, 204 Ind. at 433, 182 N.E. at 704.

The supreme court reached the same conclusion in *State ex rel. Gramelspacher v. Martin Circuit Court* (1952), 231 Ind. 114, 107 N.E.2d 666. In *Gramelspacher*, the court considered whether a statute which allowed unsuccessful candidates in primary elections for nomination to the office of representative to the Indiana General Assembly to seek a recount violated provisions of our constitution. In holding that it did not, the court, construing Ind.Const. art. 4 sec. 10, wrote:

> The primary election is the initial step in our election system looking to the nomination of candidates whose names are to appear on the official ballot in the general election. It takes the place of party nominating conventions. [citation omitted]. It is a separate and distinct step (election) to determine the nominees of

political parties for various offices to be voted for in the general election. The results of the primary election as finally determined are final and conclusive in the determination of this question
> Nomination in a primary election is in no sense an election to office. [citation omitted]. Relator here is not yet elected a member of the Legislature. If nominated he is then only placed in a position to be elected as a member if he gets the required number of votes in the November (general) election.
>
> \* \* \* \* \* \*
>
> A "primary election" is the statutory vehicle for choosing candidates by political parties, for the various offices to be filled in the general election, and, while an integral part of our election system, is not an election within the meaning of art. 4, § 10, of the Indiana Constitution.

*Gramelspacher*, 231 Ind. at 117–119, 107 N.E.2d at 668–669.[2]

■ Thus it is clear that the supreme court had defined the term "election" not to include primary elections long before the legislature passed our present election law. Where the legislature uses a term that has been judicially construed and does not explicitly provide a different definition for the term, we presume the legislature to have approved the judicial definition. *McJunkins v. State* (1858), 10 Ind. 140, 145. The legislature did not see a need to provide a definition of "election" in the present election code, and we can therefore presume that it chose to accept the definition set forth in *Martin* and *Gramelspacher*.

■ Callahan next attacks the sufficiency of the evidence supporting the circuit court's finding that Parker was a resident of Jeffersonville for at least one year before the election. Because Callahan bore the burden of proving that Parker did not reside in Jeffersonville, and because the

---

2. The *Martin* and *Gramelspacher* decisions follow the position taken by the majority of the courts which have considered whether primary elections are "elections." *See, e.g., Sylva v. Board of Supervisors* (1989), 208 Cal.App.3d 648, 256 Cal.Rptr. 138; *Hayes v. Gill* (1970), 52 Hawaii 251, 473 P.2d 872 *app. dismissed sub nom Hayes v. Lieutenant Governor of Hawaii* (1971), 401 U.S. 968, 91 S.Ct. 1200, 28 L.Ed.2d 319; *State ex rel. 25 Voters v. Selvig* (1927), 170 Minn. 406, 212 N.W. 604; *Haas v. City of Neosho* (1909), 139 Mo.App. 293, 123 S.W. 473; *White v. Manchin* (1984), 173 W.Va. 526, 318 S.E.2d 470; *see also* 29 C.J.S. *Elections* §§ 1(4), 112 and cases cited therein.

circuit court found that she failed to meet that burden, she is appealing a negative judgment. When we review an appeal from a negative judgment, we must consider the evidence and all reasonable inferences in the light most favorable to the judgment. *Pepinsky v. Monroe County Council* (1984), Ind., 461 N.E.2d 128, 135. We will affirm the judgment unless it is contrary to law—that is to say we will affirm unless all the evidence and inferences lead unerringly to one conclusion, but the circuit court reached the opposite conclusion. *Id.* In *State Election Board v. Bayh* (1988), Ind., 521 N.E.2d 1313, 1316–1317, the supreme court noted that the phrase "resided in" required actual physical presence in the relevant area.[3] Thus, we must determine whether there was any substantial evidence favoring the inference that Parker actually made his home in Jeffersonville for at least one year before the November 5, 1991, election. We find such evidence on the record.

■ Parker moved to an apartment in Jeffersonville in August or September of 1990. He stayed in the apartment five nights of every week. He attended church in Jeffersonville five or six times per week. He worked in Jeffersonville, and he was forced to surrender positions which required that he live outside of the city. He registered to vote in Jeffersonville, he listed the Jeffersonville address as his home address on both his federal and state tax returns, he received mail there, he registered his car there and his driver's license listed the Jeffersonville address as his residence. There may be other facts which might weigh against the inference that Parker resided in Jeffersonville, but we cannot say that no facts support the court's judgment that he did reside there. Under these circumstances, the judgment was not contrary to law, and we must affirm.

■ Finally, Callahan seeks attorney fees under I.C. § 34–1–32–1(b)(1) because she alleges that Parker interposed a frivolous defense when he attempted to have this action dismissed. We do not find Parker's defense to have been frivolous, and we accordingly affirm the denial of fees.

In his motion to dismiss, Parker, in essence, argued that Callahan lacked standing to challenge his nomination in the Democratic primary since she did not vote in the Democratic primary. In support of his argument, he relied on I.C. § 3–12–8–1 and I.C. § 3–10–1–6. His reliance on I.C. § 3–10–1–6, which defined eligible voters in primary elections, was misplaced because article 10 does not apply to municipal primary elections.

After Parker's attorney was informed that § 3–10–1–6 did not apply, he persisted in his argument that Callahan had no standing under § 3–12–8–1, which provides "Any ... voter who was entitled to vote for [a candidate for nomination to a local or school board office] ... may contest the nomination or election of a candidate who is declared nominated or elected to office." He argued, in essence, that Callahan voted in the Republican primary and, therefore, was not entitled to vote for a candidate for nomination in the Democratic primary. Because she was not so entitled, she had no standing to bring this action.

We do not find this argument to be frivolous. We have previously held that in a case of first impression, attorney fees are not available under § 34–1–32–1(b)(1) even if "rudimentary legal reasoning" would have led a reasonable person to believe that our courts would decide the legal question at issue adversely to the party advancing a claim or defense. *Watson v. Thibodeau* (1990), Ind.App., 559 N.E.2d 1205, 1211. In this case, Parker advanced an interpretation of I.C. § 3–12–8–1, a statute which has not yet been construed by any court. Under *Watson*, we must conclude that Callahan is not entitled to attorney fees here.

Even if *Watson* did not govern, we could not say that Parker's defense was friv-

---

**3.** The court contrasted "resided in" with "resident of" and held that the phrase "resident of" was the equivalent of domicile while "resided in" required actual physical presence.

olous, because we can not say with any degree of certainty that a construing court would not adopt Parker's reasoning. It is certainly not a patently unreasonable interpretation of § 3–12–8–1. Because we find that Parker's defense was not frivolous, we affirm the denial of fees.

The trial court is affirmed in all things, and appellant's petition for accelerated consideration and decision is denied.

AFFIRMED.

BARTEAU and CHEZEM, JJ., concur.