BEABER *v.* BEABER.

[Cite as Beaber v. Beaber (1974), 41 Ohio Misc. 95.]

(No. DR61269—Decided September 25, 1974.)

Court of Common Pleas of Stark County, Family Court Division.

*Mr. Harry Shaheen* and *Mr. Nicholas Caplea*, for plaintiff.

*Mr. Virgil Mills*, for defendant.

READER, J. This matter came on for trial on the complaint of the plaintiff-wife requesting a divorce on the

grounds of gross neglect of duty and extreme cruelty. The husband had filed an answer and cross complaint on the grounds of gross neglect of duty and extreme cruelty. Both parties, through counsel, had employed discovery under the Civil Rules; had filed the appropriate pleadings, and the court is satisfied that the pleadings are in order, and is further satisfied it has jurisdiction of the parties and the subject matter.

### SEPARATE FINDINGS OF FACT

1. The parties were married March 26, 1966, in Canton, Ohio. There have been two children born as issue of this marriage, both of whom are girls of the approximate ages of five and seven as of the time of hearing. Both parties have been married previously and there had been no issue of either union. There is 14 years difference in the ages of the parties, defendant-husband being the elder.

2. The marriage of the parties, at least on the surface and as far as the defendant was concerned, did not appear to suffer any more problems than most marriages. Although not known to the defendant, the plaintiff was beginning to have second thoughts about her marriage early in 1971, prior to the purchase of their first real home. She did not make this known, however, and the parties went in debt to purchase the real estate. Some time during February or the early part of March 1972, the defendant became suspicious of his wife's activities, especially as it related to her attendance at the Spiritulist Church in Massillon, Ohio. Also, he began to have phone calls at his home which were the harrassment type of phone call or where upon lifting the receiver and answering he heard nothing but silence until the phone was hung up.

Some time near the end of March of that year, the defendant employed the Paramount Detective Agency to follow his wife and determine her activity. At the same time he received from the Paramount Detective Agency electronic equipment and the instructions on how to tap his own telephone lines. He proceeded to tap his own telephone in his own home on or about April 6, 1972. From that date until approximately April 30, all calls, both incoming and out-going, were taped. This resulted in approximately 66

hours of taped conversations of both him and his wife. Also, near the end of March the defendant followed his wife after she had allegedly left the home to attend a church service and observed her in the arms of one, John Brunner, while standing in the driveway of a friend.

3. The defendant's testimony as to what occurred during the months of December, January, February, March and April at first blush would lead the hearer to the conclusion that he was suffering from paranoia. His accounts of incidents where he was kicked in the groin, screamed at, where he was accused of all sorts of indecent sexual advances and beatings seemed to be experiences almost unbelievable in context.

4. The plaintiff's testimony with its vivid description of what the defendant had done to her was quite believable. However, the court overruled the motion to suppress the taped telephone conversations and these tapes were used on cross examination to impeach her testimony. These taped conversations completely obliterated the testimony of the plaintiff. It became very evident that the plaintiff was having an illicit affair with John Brunner and had been for some time. Also, that she had had during her marriage to the defendant at least two other affairs.

It also became most apparent that the plaintiff was the aggressor, that she sought advice from John Brunner as to how and what she could or should do to prove that her husband was suffering from a paranoid reaction. This advice was given and carried out within the confines of the marital home, and the defendant found himself in an impossible situation relative to his own defense. The plaintiff faked injury, initiated arguments and was physically aggressive hoping that the defendant would lose his patience and would strike her.

Not only did the plaintiff conspire as against her husband but also in order to gain favor she lied to her attorneys, her friends and her parents as to her relationship with Brunner or with anyone other than her husband. She succeeded until the admission of the tapes. Although she identified the voices and did not deny the essence of the conversations, she was evasive and claimed a mere infat-

uation. This cannot be believed when the tapes are listened to by anyone with any intelligence or common sense, for they denote and speak of love and sexual relations, of advice, both legal and practical, as to how to place her husband in the worst light.

The plaintiff rarely spoke for less than 40 minutes or an hour at a time and obviously did not suspect nor even believe that her unfaithfulness or deceitfulness would ever be found out. Near the end of April 1972, the plaintiff did discover the tapped telephone line and made an effort to retrieve the electronic equipment but failed to do so. Despite the fact that she must have known that her telephone conversations were taped, she never, even to the last day of hearing, ever disclosed to those around her the contents of these conversations.

5. The parties lived in the marital home after the complaint and answer and counter-claim were filed until June 1972, when the plaintiff moved to her parent's home. She remained there until September of the same year and moved to North Canton. She remained there until July 1973, when she moved to S. W. Canton, where she stayed until March 20, 1974. She then moved again in Canton. During this period of time, there is only one reported incident wherein John Brunner visited her, and this took place in North Canton. A concerted effort was made by the Paramount Detective Agency in December 1973, and observation was made practically around the clock for the entire month. The results are inconclusive. Although there were people going in and out during this period of time, there is no concrete evidence that the plaintiff was doing anything illicit.

6. When the parties separated, the defendant was accorded visitation privileges and the problems have been many due to the deterioration of the relationship of the parties and the animosity that devoloped over the period of time.

The testimony from the witnesses conclusively indicates that the defendant properly cared for his children physically and emotionally. There is some indication that

he might have made some statement to his children that their mother was unfit; that he wanted them and that he would care and provide for them.

The court in talking with the children cannot completely determine whether these statements were made by the defendant or were told to the children by the plaintiff in order to place the defendant in a defensive position.

The defendant has paid according to the order of support and there was no arrearage at the time of hearing.

STATEMENT OF LAW:

There were a number of legal issues brought to the attention of the court primarily by motion of the plaintiff. The court will discuss them, not in any particular order relative to their importance.

Plaintiff's counsel moved under Civil Rule 26(B) (4) that the defendant's failure to indicate witnesses, names, and addresses whose testimony would be used during the trial of the proceeding should be eliminated. The court finds that the testimony sought to be eliminated is not expert testimony but only testimony that relates to the character of the defendant and does not go to the merit of the case. Defendant's counsel submitted the names and addresses of all witnesses prior to trial that had anything to do with the merits of the proceedings. Therefore, the Court feels that the motion was properly overruled.

The issue as to the taped telephone conversation is of extreme importance in this case. An interesting factor is that the tapes were subpoenaed by plaintiff's counsel and once produced, plaintiff's counsel objected to their admission at various stages of the trial. These objections were overruled, and the tapes were admitted.

As background in this matter, it must be stated that the tapes were under a protective order of the federal District Court in Cleveland, Ohio. It is a matter of record that there is a case pending in the federal District Court between the defendant in this case, the Paramount Detective Agency, and some of the parties whose conversations were taped during the period of time the telephone was tapped in the defendant's home. Prior to the hearing of the within

case, these tapes were brought to the Family Court Division by discovery. However, counsel did not listen to the tapes and the tapes were placed in a safe with the prosecutor of Start County. Immediately prior to trial, the tapes were delivered to this court. During the trial of this matter, the tapes never left the custody of the court, and counsel never listened to the tapes except in each other's company and the company of the bailiff or in the courtroom setting during trial.

The court finds that proper foundation as to credibility was proven by the testimony of the plaintiff and the defendant. The court is satisfied that the tapes are competent, authentic and correct, and further, that no changes or additions or deletions were made. The court is further satisfied that the recordings or tapes were preserved.

Both plaintiff and defendant through counsel submitted briefs on the issue of whether or not the taped conversations were admissible as evidence. The court finds there is in fact a dearth of judicial interpretation relative to this issue. The applicable statutes are R. C. 4931.28 and 2933.58 (A and B). The first, R. C. 4931.28, is entitled: "Interferring with telegraphic or telephone messages," and states:

"No person shall willfully and maliciously cut, break, tap or make connection with a telegraph or telephone wire or read or copy in an unauthorized manner, a telegraphic message or communication from or upon a telegraph or telephone line, wire, or cable, so cut or tapped, or make unauthorized use thereof, or willfully and maliciously prevent, obstruct, or delay the sending, conveyance, or delivery of an authorized telegraphic message or communication by or through a line, cable, or wire, under the control of a telegraph or telephone company."

R. C. 2933.58 entitled: "Eavesdropping; wiretapping," states:

"(A) Except as provided in this section, or as permitted under the laws of the United States, no person shall willfully, surreptitiously and by means of any device listen to, transmit, amplify, or record a private oral communication carried on in circumstances which reasonably indi-

cate that the parties thereto desire it to be confined to them, and no person shall willfully disclose or willfully use or attempt to use any information, knowing or having reasonable cause to believe such information was obtained in violation of this section.

"Whoever violates this section shall be fined not more than one thousand dollars or imprisoned not less than one nor more than three years, or both.

"(B) This section does not apply to communications by or through a line, cable, or wire under the control of a telegraph or telephone company, or to communications in which at least one party thereto, in order to prevent a crime or bring an offender to justice, has consented in advance to such communications being listened to, transmitted, amplified, or recorded, or to communications carried on publicly or under circumstances in which the parties thereto might reasonably expect such communications to be listened to, transmitted, amplified, or recorded."

As stated previously, the Court finds no Ohio reported case directly in point. In the case of *Sackler* v. *Sackler* (1964), 15 N. Y. 2d 40, 203 N. E. 2d 481, 5 A. L. R. 3d 664, the New York Court of Appeals stated that evidence allegedly illegally obtained does not destroy its credibility or admissibility in evidence provided it is otherwise relevant and material. The court further stated neither the Fourth Amendment to the United States Constituion nor the prohibition against unreasonable search and seizures in the federal and state constitutions applies to acts by nongovernmental persons—in this case the defendant—and such provisions do not apply in civil cases.

A case decided by the District Court of Appeal of Florida, First District, on June 20, 1972, reported as *Markham* v. *Markham*, 265 So. 2d 59, and affirmed by the Supreme Court of Florida on January 31, 1973, 272 So. 2d 813, appears to be factually directly in point. The undisputed facts in the *Markham* case were that the husband tapped the marital phone in his own home and taped the conversations of his wife and her lover without their knowledge and that neither party to the conversations consented to the taping or interception of their conversations. The wife,

through counsel, appealed the trial judge's admission of the taped conversations in evidence, relying upon Title 18, Section 2518, of the Omnibus Crime Control Bill of 1968, and Section 934.06 of the Florida statutes. The District Court sustained her appeal and reversed the trial court, stating that the tapes were not admissible but did not rely upon the Omnibus Crime Control Bill, relying upon the Florida statutes and the Florida Constitution. Section 934.-03 of the Florida statutes shows similarity to Ohio eavesdropping statute, and it is a criminal statute with criminal penalty assessed for its violation. The Florida District Court determined that there was no special right as between married persons which would permit the husband to invade the privacy of his wife and quoting from Section 934.01(4) of the Florida statutes stated:

"To safeguard the privacy of innocent persons, the interception of wire or oral communications when none of the parties to the communication has consented to the interception should be allowed only when authorized by a court of competent jurisdiction [and should remain under the control and supervision of the authorizing court]. * * *."

The District Court further stated that the emerging rights of women further buttress her right of privacy as accorded to her by the constitution of Florida and of the United States.

The dissenting opinion in the *Markham* case upon appeal to the Florida Supreme Court is worthy of note. In that dissent, Judge Woodrow H. Melvin stated that it was his belief that the legislative authority of both the state of Florida and of the Congress of the United States never contemplated the applicability of the right of privacy to that extent in the marital relationship. To that thesis this court concurs.

On March 8, 1974, in the case of *Simpson* v. *Simpson*, 490 F. 2d 803, the United States Court of Appeals, Fifth Circuit, was faced with the direct issue in this instant case. The facts in that case were that the husband tapped the phone line within his own home and intercepted conversations between his wife and another man. He then played these tapes or portions thereof to various neighbors and

family members and to a lawyer on whose advice the wife agreed to an uncontested divorce. After the divorce the wife filed in the federal District Court for civil damages, arguing that her claim was bolstered by constitutional protections of privacy and emerging concepts of women's rights. The particular issue discussed in the opinion of the Court of Appeals is the scope of the wire interception provision of the Omnibus Crime Control and Safe Streets Act of 1968.

The court wrote a very lengthy and exhaustive discussion and interpretation of the different sections of the Crime Bill, especially that which relates to the interception or disclosure of wire communications and concluded the following:

1. That the basic purpose of the Act was to combat the ''crime problem''.

2. The legislature never contemplated the intimate question of familial relations as it related to intercepted messages or telephone taped conversations.

3. Since Title III of the Act had the primary goal of controlling crime, it also prescribed criminal sanctions for violators, and thus such language of an act must be strictly construed to avoid ensnaring behavior that was not clearly proscribed.

The court concluded that the Act contained inconclusive language, was not sufficiently definite and specific. They further concluded no government or public official was involved and that the *locus in quo* does not extend beyond the marital home of the parties.

This court is convinced that any other finding relative to the admission of these tapes would be a denial of justice to the defendant in this cause. The marital home is and should be the private concern of the two parties of the marriage. What takes place behind that marital veil is not normally a public concern or discernment When one of the parties violates the marriage contract, within the confines of the home and is sufficiently secretive so as to avoid public knowledge, the other party is placed in an indefensible position. To deny the admission of these tapes would be to deny the defendant the only material, credit-

able evidence that he was able to obtain.

Therefore, this court is satisfied that the tapes were properly admitted so as to impeach the testimony of the plaintiff, and further, that neither the statutes, the Ohio Constitution, the federal Constitution as it relates to the right of privacy, nor the Omnibus Crime Control Act prevent the admission of said tapes.

This court is of the nature to believe from statutes of this state as well as judicial interpretation that both parties in a divorce action stand on an equal footing or right as it relates to the custody of their minor children. Upon hearing the testimony of all of the parties and witnesses, the court shall decide which of them shall have the care, custody, and control of the minor children, taking into account that which would be in the best interests of said children.

In most cases, courts award the custody of young children, especially girls, to the mother. It is thought that the mother can better care for her young female children. This case is further complicated by the fact that the plaintiff has had the custody of the young girls during the entire pendency of the suit, and if they had a choice at this tender age they would choose to live with their mother. The court is aware of this truth and would expect it to be nothing less.

There is some case law to the effect that the party who has committed the wrong should not receive custody of the children. This court does not necessarily subscribe to that opinion. However, this case presents this issue: Should a mother who has thoroughly demonstrated a lack of moral understanding, who has lied, cheated and deceived her husband be entrusted to the upbringing of minor female children? This court is satisfied that the answer must be in the negative. The father, although he will have difficulty, should be given the opportunity to raise his daughters in a moral and ethical climate, and therefore the court awards custody of the two minor children, issue of this marriage, to the defendant until further order.

The previous order of specific visitation accorded to the defendant will now be accorded to the plaintiff.