IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 30, 2001 Session

# KEVIN JULIAN JOHNSON v. DONNA COLE JOHNSON

**Appeal from the Chancery Court for Williamson County**
**No. II-26076     Russ Heldman, Chancellor**

---

**No. M2000-00358-COA-R3-CV - Filed August 28, 2001**

---

This appeal involves the dissolution of a ten year marriage. The trial court awarded the husband a divorce after concluding that the wife was guilty of inappropriate marital conduct. The trial court granted custody of the parties' three minor children to the father and refused the mother visitation rights, and held her in criminal contempt of court. The wife now appeals. We have determined that the trial court properly awarded custody to the father but the trial court erred in refusing the mother visitation, and in convicting her of criminal contempt. Accordingly, we affirm in part and reverse in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part and Reversed in Part**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S. and WILLIAM C. KOCH, JR., joined.

John M. Cannon, Goodlettsville, Tennessee, for the appellant, Donna Cole Johnson.

William Donnell Young, Jr. and Thomas F. Bloom, Nashville, Tennessee, for the appellee, Kevin Julian Johnson.

## OPINION

The parties met in 1984 while both were employed at N.E.S. Donna Cole became pregnant in 1987 with the parties' first child. The parties began living together in July 1988. They eventually married in April 1989 and two months later, twins were born to the marriage.

The marriage was very turbulent and the record is replete with instances of verbal abuse and episodes of violence.

On March 5, 1999, Mr. Johnson filed a complaint for divorce in the Chancery Court for Williamson County on the grounds of irreconcilable differences and inappropriate marital conduct. He sought custody of the parties' children. He filed for an order of protection alleging that Mrs.

Johnson had violent and destructive rages in front of the children including cutting his tires, breaking a side mirror on his truck, and shouting obscenities at him. An *ex parte* order of protection was issued.

On March 9, 1999, a show cause order was entered compelling Mrs. Johnson to appear to show cause why Mr. Johnson should not be awarded custody of the parties' three minor children. On that same date, the court entered a temporary restraining order removing Mrs. Johnson from the parties' residence and placing custody of the children with Mr. Johnson pending a hearing.

On April 28, 1999, the parties entered an agreed order allowing Mrs. Johnson to return to the marital residence, and providing that Mrs. Johnson would terminate all contact with her paramour, Mr. Harbison, pending the final hearing of the case.

On June 3, 1999, Mrs. Johnson filed a counter-complaint for divorce on the grounds of irreconcilable differences and inappropriate marital conduct. She also sought custody of the children. She filed for an order of protection on June 9, 1999, alleging that Mr. Johnson had stopped the school bus she drove, knocked the sunglasses off of her face, cursed her, and committed other violent acts. An *ex parte* order of protection was issued.

On June 22, 1999, an order was entered providing alternating weeks of custody in the marital home and that Mrs. Johnson was restrained from any contact with Mr. Harbison.

On August 26, 1999, Mr. Johnson filed a petition for contempt alleging Mrs. Johnson continued contact with Mr. Harbison in violation of the parties' agreed order and the court's restraining order, and that Mrs. Johnson had the minor children at Mr. Harbison's home. On October 7, 1999, Mrs. Johnson responded to the contempt motion admitting she spent time with Mr. Harbison.

The trial court entered an order on December 17, 1999, stating as follows:

> [T]he Court having heard sufficient proof to cause the Court concern for the physical and moral welfare and safety of the minor children of the parties based upon the admissions of the Defendant, Donna Cole Johnson, concerning her attitude toward this Court's Orders and her attorney's advice and directions, and the Court being of the opinion it now is compelled to issue a <u>Pendente Lite</u> Order pending the final judgment of this cause . . . .

The Final Judgment and Decree of Divorce was entered on January 20, 2000, finding in part:

> As to the matter of the divorce, the Court finds Defendant has willfully lied and committed perjury in her testimony and on the case of <u>Inman v. Inman</u>, WL 122984 (Tenn. App. 10/18/92), the Court will not grant Defendant any affirmative relief in this matter and her Counter-Complaint for Divorce is dismissed; that Plaintiff is

entitled to an absolute divorce from the Defendant on the grounds of inappropriate marital conduct; . . . [T]hat considering the cases of <u>Gaskill v. Gaskill</u>, 936 S.W.2d 626, 634 (Tenn.App. 1996) and <u>Suttles vs. Suttles</u>, 748 S.W.2d 427 (Tenn. 1988) in making its decision regarding custody and visitation as well as the statutory factors, demeanor and credibility of the parties, of the witnesses, the Court awards sole and exclusive custody of the three (3) minor children of the parties to Plaintiff; that Plaintiff is enjoined and restrained from delegating any corporal punishment on the minor children for disciplinary reasons or other reasons to any third party; . . . that as shown in <u>Gaskill v. Gaskill</u>, supra, a parent who is fundamentally dishonest, profane in his or her speech to children, does not obey the Court's Order or the authority of the Court is not a good example to children; that if the adultery exposes the children to some physical, emotional or moral harm, then the adultery takes on greater significance in the analyzing of factors; that it appears to the Court that Defendant would like for Plaintiff to be dead, that Defendant has no respect or certain moral norms concerning telling the truth in court, concerning following court orders, concerning the adultery issue, concerning the speaking of proper language in the presence of children, the Court finds if it permits Defendant the right of visitation it will indeed jeopardize these children in both a physical and moral sense; that upon <u>Suttle v. Suttles</u>, supra, the Court shall not grant Defendant any visitation with the minor children of the parties because to set visitation requires visitation be set by Court Order and Defendant has shown she cannot follow the Court's Orders and the Court has no confidence whatsoever these children would be anything but morally and physically jeopardized by being under Defendant's care; that the only contact the Defendant shall have is two (2) hours telephone privileges with the minor children, that being one (1) hour on Sunday evening and one (1) hour on Wednesday evening, with Defendant being enjoined and restrained from making any derogatory remarks about Plaintiff/Father or using any profanity during these conversations with the children . . . .

. . . .

It is further ORDERED, ADJUDGED AND DECREED Plaintiff is hereby awarded sole and exclusive custody of the three (3) minor children, Hank Johnson, Jesse Johnson and Kayce Johnson. Plaintiff is enjoined and restrained from delegating any corporal punishment on the minor children for disciplinary reasons or other reasons to any third party. Further, Plaintiff is enjoined and restrained from using any corporal punishment on the minor children except as means of last resort or extreme circumstances;

It is further ORDERED, ADJUDGED AND DECREED Defendant shall have no visitation or contact with the minor children of the parties except as hereinafter ordered. Defendant is awarded telephone privileges with one (1) or all three (3) of the parties' minor children for one (1) hour from 7:00 p.m. until 8:00 p.m. on Sunday

evening and one (1) hour from 7:00 p.m. until 8:00 p.m. on Wednesday evening. Plaintiff shall put all three (3) minor children in a room with the telephone to talk with their Mother for this one (1) hour on each Sunday and Wednesday. Defendant is hereby enjoined and restrained from making any derogatory remarks about Plaintiff/Father or using any profanity during these conversations with the minor children.

The appellant has presented this Court with six issues on appeal: whether the trial court erred in (1) admitting into evidence illegally obtained audio tapes, (2) excluding witnesses and offers of proof from the appellant, (3) awarding custody to the father; (4) terminating appellant's visitation rights, (5) finding appellant in criminal contempt, and (6) entering an order for forged checks without an amount or proof of use of the funds. We address the issues in the order presented by Appellant.

AUDIO TAPES

Appellant first asserts that the trial court erred in admitting into evidence illegally obtained audio tapes.

Prior to the 1994 amendments, the federal Omnibus Crime Control and Safe Streets Act, forbidding nonconsensual interception of wire and electronic communications, did not apply to the interception of conversations transmitted by way of radio waves from a cordless telephone. *McKamey v. Roach*, 55 F.3d 1236, 1995 FED App. 0180P (6th Cir. 1995).

Prior to Chapter 970 of the Public Acts of 1994, sections 1 and 4, now codified as Tennessee Code Annotated section 39-13-604, no Tennessee law prohibited recording and dissemination of cordless telephone transmissions. Under this Act, " '[c]ordless telephone' means a two-way, low power communication system consisting of two (2) parts, a 'base' unit which connects to the public switched telephone network and a handset or 'remote' unit, that are connected by a radio link and authorized by the federal communications system to operate in the frequency bandwidths reserved for cordless telephones." Tenn. Code Ann. § 39-13-604(a)(3). This statute further provides that "[n]o recording of a protected communication, or any information contained therein, may be used in evidence unless such recording was obtained in accordance with the provisions of this section; provided, that nothing in this section shall be construed to preclude the introduction of evidence derived independently from sources other than the record." Tenn. Code Ann. § 39-13-604(f)(7).

Kevin Johnson's sister and brother-in-law, Mr. and Mrs. Dotson, lived across the street from Mrs. Johnson. They used a police-type scanner to intercept the telephone conversations between Mrs. Johnson and Mr. Harbison and other friends of Mrs. Johnson.

The evidence is clear that Mrs. Johnson was using a "remote" unit and that the scanner used by Mr. and Mrs. Dotson to intercept, record and disseminate her telephone conversations violates Tennessee Code Annotated section 39-13-604.

The tapes were admitted into evidence during cross-examination of Mrs. Johnson for purposes of impeachment.

When confronted on cross-examination about her intemperate and profane language, much of which was in the presence of the children, Mrs. Johnson testified:

Q. Now, you said that you used to use bad language. When did you stop using bad language?
A. Since I got away from Kevin, I'm in a better mood and I'm happier now and everything seems to be - -
Q. What is the date of that please ma'am?
A. I don't know. I would say March and April were rough months, and my language has drastically changed since then.
Q. So you haven't used any real bad language since April of '99?
A. I may have said a few. I don't do it as much as I used to, is what I said.
Q. Do you still use bad language?
A. On occasion, but we have started the thing with me and the kids and Carl all of us that whoever says a bad word has to put a quarter in the jar.
Q. Have you ever said that you didn't give an F about the Court's order?
A. No.
Q. You never said that?
A. No, sir.
           THE COURT: When he says F, I assume you're meaning there is a bad word that comes after it?
           MR. YOUNG: Yes, sir.
           THE COURT: With that clarification have you ever?
           WITNESS: Not that I recall, no.
BY MR. YOUNG:
Q. Your husband works for Nashville Electric Service?
A. Yes, sir.
       . . . .
Q. Have you ever told anybody that you wanted the SOB to die?
A. No.
Q. Never done that?
A. No, sir.
Q. To die a horrible death?
A. I have said that because Kevin - - I said he would die. My father died in January and I was going to take care of my father, we took shifts, making them up to help my step-mother to take care of him because she was all on her own, and he told me have you forgotten you have responsibilities at home, and I had the house cleaned, the kids had done their homework, and I had cooked that night, and was gone to take care of my father and Kevin called and told me I had forgotten I have responsibilities at home, for. I told him that for you saying that means you are going

to die a horrible death. My father had cancer for two years and two weeks before he died.

Q. Have you [ever] told anybody that you hoped he died a horrible death, or that he suffered a lot, anything like that?

A. No, sir, I think everything you do will come back to you, whether it's on earth or when you die.

Following this testimony, counsel for Mr. Johnson offered the illegally intercepted audio tapes of Mrs. Johnson's telephone conversations, with Carl Harbison and with others, for the purpose of impeaching the testimony of Mrs. Johnson. After considerable legal argument, the court allowed the audio tapes to be played. To say that the audio tapes thoroughly impeached the testimony of Mrs. Johnson is an understatement.

After playing the first tape, the following occurred:

THE COURT: Why did you tell the Court before Mr. Young played this tape that you hadn't said certain of these things?

WITNESS: Whenever I'm carrying on a conversation I don't recall everything that I say. That was the eighth time I had been arrested that week. He wouldn't let the kids call me on Thanksgiving. It was horrible. My uncle had passed away. It was a very upsetting week. I honestly couldn't tell you what I said yesterday, but I know the kids weren't there listening. They were at school.

BY MR. YOUNG:

Q. We have some more, ma'am. Your children have never been there and listened to that kind of language?

A. I'm not sure. We have started making a jar where you have to put in a quarter for bad words. I never lowered myself to tapping the phone on Mr. Johnson. And I have known all along they had my phone tapped or they couldn't have followed me to Columbia or the bowling alley or anything else.

While Mrs. Johnson did not consent to the interception of her telephone calls, it is difficult to conceive of how she could use the kind of language that she used in her telephone conversations with Mr. Harbison and with others when she knew all the time that her phone was being tapped. The question, however, is whether or not the illegally obtained tapes are admissible in evidence for impeachment purposes. There is case law that can be used to support the proposition that the trial court was not in error in admitting the tapes for impeachment of Mrs. Johnson. *See Anthony v. State*, No. 02C01-9805-CC-00159, 1999 WL 569560, at *13 (Tenn. Crim. App. 1999); *see also State v. Electroplating, Inc.*, 990 S.W.2d 211, 226 (Tenn. Crim. App. 1998); *see also State v. Mason*, No. 01C01-9509-CC-00288, 1997 WL 211245, at *9 (Tenn. Crim. App. 1997); *see also State v. Hopper*, 695 S.W.2d 530, 538-39 (Tenn. Crim. App. 1985).

However, the statute is clear in its prohibition against admissibility as "evidence." Tenn. Code Ann. § 39-13-604. It is clear that in many cases it has been held that evidence inadmissible

under the criminal exclusionary rule may nevertheless admissible for impeachment.

> Evidence obtained through illegal means and, for that reason, rendered inadmissible by the exclusionary rule, is nevertheless admissible to impeach the direct testimony of the defendant in a criminal case, *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), and also to impeach the defendant's "answers to questions put to him on cross-examination that are plainly within the scope of the defendant's direct examination." *United States v. Havens*, 446 U.S. 620, 627, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980). This constitutionally permissible impeachment is not limited to evidence that merely attacks the quality of a defendant's testimony. Rather, *Walder* and *Havens* clearly authorize the use of "impeachment" evidence which is relevant to substantive issues and which usually implicates the defendant on the ultimate issue of guilt. In these cases, illegally-obtained physical evidence used to impeach the defendant-witness would have cogently inculpated the defendant, were it not for the limitations on use. *See also Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (allowing impeachment through the use of a *Miranda*-deficient confession). Nevertheless, as a function of the constitutional rule and not any evidentiary rule, such evidence is not to be used in the "government's direct case, or otherwise, as substantive evidence of guilt." *Havens*, 446 U.S. at 628, 100 S.Ct. at 1917. Thus, under the constitutional rule, "impeachment" does not refer to precisely-crafted rules of evidence so much as it signifies a general policy of not permitting "false testimony [to] go unchallenged." *Id.*, 446 U.S. at 627, 100 S.Ct. at 1917.

*State v. Electroplating, Inc.*, 990 S.W.2d 211, 226 (Tenn. Crim. App. 1998).

The Supreme Court of Indiana addressed an analogous factual situation:

> In *Beaber v. Beaber*, (C.P. Stark Co. 1974) 41 Ohio Misc. 95, 322 N.E.2d 910, a trial judge held that neither the federal wiretap statutes nor the right of privacy under the United States Constitution prevented him from listening to a husband's wiretapping of a wife's telephone conversations in the marital home. The court reasoned, in this divorce proceeding wherein child custody was in issue, that he was only listening to the tapes for impeachment purposes. On the basis of other evidence before him, the judge thought that the husband was in an "indefensible position" without the tapes, since the husband's testimony alone seemed "almost unbelievable" until the tapes were admitted, which tapes vindicated him and "completely obliterated" the otherwise believable testimony of his wife. *Id.*, 41 Ohio Misc. at 97, 103, 322 N.E.2d at 912, 915. The trial judge's opinion was affirmed in an unpublished opinion by the Ohio Court of Appeals, *Beaber v. Beaber*, No. 4187 (Ohio App., 5th Dist., Aug. 4, 1975). The Ohio Court of Appeals also saw the question as one of admitting the wiretaps solely for purposes of impeachment, upon the issue of witness credibility relative to alleged perjury in fraudulently obtaining a court order, rather

than as a question of using such wiretaps as substantive proof in the case, absent perjury. *Id.*, slip op. at 14-15. The court concluded, after recognizing the federal line of authority that otherwise unconstitutional evidence can be used for impeachment purposes, that:

> "The law has justice not injustice as its purpose. Justice not injustice is the end sought by the United States Constitution, the Constitution of the State of Ohio, and by the laws of the United States, of the State of Ohio, and the Courts. Although under some other circumstances the tapes might be constitutionally inadmissible or their admission might be prohibited by statute, under the facts of the instant case there can be no justification for permitting the plaintiff to turn the method by which the tapes were obtained to her own advantage, and thus provide herself with a shield against contradiction of her own untruths."

*In re: Marriage of Lopp*, 378 N.E.2d 414, 701-02 (Ind. 1978).

Appellant argues that the trial court's ruling on custody and visitation was based largely on the evidence presented from the audio tapes. Unlike *Beaber v. Beaber*, there is ample evidence in this record, independent of the tapes, to support the action of the trial judge in both granting the divorce to Mr. Johnson and in awarding him custody. Under such circumstances, even if the admission of the audio tapes into evidence was error, such error was harmless considering the evidence at trial supporting the trial court's decision. It does not justify reversal on the merits of this case. *Hamm v. Hamm*, 614 S.W.2d 366, 371 (Tenn. Ct. App. 1980); Tenn. R. App. P. 36(b).

The appellant has a problem controlling her temper and obscene language around her children. Testimony from the parties and witnesses at trial reveals the unfitness of the appellant. The mother testified that she got into it with her child's teacher because the teacher told the father's sister that the eldest child, Hank, had a learning disability. The mother testified that she did not consider the learning disability anyone's business and that it was not for the community to know about it.

Timothy Bennett, Jesse's baseball coach, testified that during a tournament game, the appellant cussed him out in the dugout where children were present. She used profane language in front of the whole team, including her child. The children on the team were approximately nine years old. Michelle Bottoms testified that she attempted to calm the appellant down but it did not work so she got her own son out of the dugout so he would not hear the language she was using. The father was not present but he apologized to Mr. Bennett for his wife's behavior at a later time.

Mrs. Bottoms further testified that she saw the appellant, Ms. Johnson, jerk her children around when the children were young and heard her make statements that she would "slap the shit out of them."

Rick Hensel, Kayce's baseball coach, testified that when he was in the middle of the ballfield the mother cussed him out using sexually explicit language.

Clark Presley also testified that he witnessed the mother using profanity on the ballfield. He also testified that when she arrived for her week of custody at the martial home, she again used sexually explicit profanity.

Joann Johnson, Mr. Johnson's mother, testified that the appellant spit in her face in front of the children and used profanity. Hank Johnson, the parties' eldest child, testified that he witnessed the appellant, his mother, spit in his paternal grandmother's face.

A number of witnesses testified as to the appellant's repeated use of sexually explicit profanity in the presence of both her own children and other children as she undertook to berate baseball coaches during the children's ball games. Thus, the tapes were a minor factor in determining the appellant's unfitness as a parent. From the testimony at trial, it is clear that it is in the best interest of the children to be in the custody of the appellee.

EXCLUSION OF WITNESSES AND DENIAL OF OFFERS OF PROOF

The trial court found that Appellant had unclean hands applying the analysis of that doctrine found in *Inman v. Inman*, 1989 WL 122984 (Tenn.Ct.App. 1989). The trial court erred in applying the doctrine of unclean hands to the present case. "[U]nclean hands does not necessarily repel a petition regarding the welfare of a child which predominates over any offended dignity of the court." *Haynes v. Haynes*, 904 S.W.2d 118, 120 (Tenn.Ct.App. 1995) (citing *Strube v. Strube*, 53 Tenn. App. 88, 379 S.W.2d 44 (1963) and authorities therein)). The primary concern is for the best interest of the child.

In *Strube v. Strube*, this Court observed:

> The third ground, namely, that appellant comes into court with unclean hands might in some cases be sufficient justification for denying a hearing to appellant. As was said by Mr. Justice Cook, however, speaking for the Supreme Court in *State ex rel. Daugherty v. Rose*, 167 Tenn. 489, 71 S.W.2d 685, "When such proceedings involve the custody of children, they are not decided according to the strict legal right of the petitioner, but are dependent upon the child's welfare." And in *State ex rel. French v. French*, 182 Tenn. 606, 188 S.W.2d 603, Mr. Chief Justice Green, speaking for the Supreme Court, where a similar question was presented, said, "If it be said that the father is in contempt of the Ohio courts, nevertheless we think he might be heard if the welfare of the boy so dictated. The Ohio courts would not likely penalize the boy for the father's contumacy." For the same reason, we think the father, in the instant case, is entitled to a hearing on the merits of his appeal.

*Strube v. Strube*, 53 Tenn.App. 88, 96, 379 S.W.2d 44, 48 (Tenn. Ct. App. 1963).

The trial court refused to allow Appellant to submit certain offers of proof for excluded witnesses and to call the minor children as witnesses. Appellant argues that the trial court erred in refusing to allow Appellant to make her offers of proof which constitutes reversible error. The Chancellor did not allow certain of Mrs. Johnson's witnesses to testify or offer proof from those witnesses, James Borenstein, Ralph Head, or Lisa Coleman (the children's guidance counselor). It is error for a trial judge to refuse an offer of proof. *Geyer v. Geyer*, No. 01A01-9707-CH-00372, 1998 WL 68934, at *4 (Tenn. Ct. App. Feb. 20, 1998).

At the trial, the Chancellor invoked the Rule for sequestration of witnesses upon request of counsel for Mrs. Johnson. The trial court, upon motion of counsel for Mr. Johnson, excluded Mr. James Borenstein as a witness because he and Mrs. Johnson spoke about the case. The trial court also excluded Mr. Ralph Head because Mrs. Johnson had called him the day prior to his appearance. The children's proffered testimony was provided to the court so the trial court could determine whether to allow them to testify.

"[T]he trial court is given broad discretion in deciding whether to exclude the testimony of witnesses who may have violated Rule 615. *See Anderson v. Otte*, No. 02A01-9402-PB-00023, 1995 WL 116013, *4 (Mar. 15, 1995 Tenn. Ct. App.). The trial court's determination whether to exclude witnesses who have violated the Rule will not be reversed unless the trial judge abused its discretion. *Id*. The Chancellor did not abuse his discretion in excluding the witnesses.

Lisa Coleman took the stand and counsel for Mr. Johnson objected on the ground of hearsay. The court, after hearing arguments, determined that statements of the children to Mrs. Coleman were hearsay and sustained the objection. The court did not allow offers of proof on these excluded witnesses. In *Alley v. State,* 882 S.W.2d 810, 815 (Tenn.Crim.App. 1984), the general rule was stated that "assuming an offer of proof has been reasonably made, it is error for the trial court to refuse to permit counsel to state what evidence he is offering."

"The purpose of an offer is two-fold. First, the proof informs the trial court what the party intends to prove . . . [s]econd, an offer creates a record so that an appellate court can determine whether there was reversible error in excluding the evidence." *State v. Torres*, No. E1999-00866-CCA-R3-DD, 2001 WL 245137, *32 (Tenn.Crim.App. Mar. 13, 2001).

Rule 103 of the Tennessee Rules of Evidence provides, in part:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
>
> . . . .
>
> (2) offer of proof. - - In case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context.

Tenn. R. Evid. 103.

From the record before the Court, the offer of proof as to Mr. Head concerned some conversation he had with Mr. Johnson outside the courtroom at one of the hearings in July. As to the testimony of the three children, the trial court examined written questions and answers involving the three children and while the court disallowed the testimony of the children, these questions and answers appear in the record. Assuming the testimony of the children would be consistent with the questions and answers appearing in the record, it is difficult to see how such testimony could have affected the outcome of the case.

Although it was error for the trial judge to refuse the offers of proof, it is apparent from the context of the record that the offers of proof in the present case, more probably than not, would not have affected the judgment in the case or resulted in prejudice to the judicial process. Tenn.R.App.P. 36(b).

Given the broad discretion of the trial court in determining whether to exclude a witness suspected of violating Tenn. R. Evid. 615, *State ex rel. Commissioner v. Williams*, 828 S.W.2d 397, 401-402 (Tenn. Ct. App. 1991), and the context of the record relative to the offers of proof, any error of the trial court in this respect is harmless and not a basis for reversal. Tenn.R.App.P. 36(b).

CUSTODY AND VISITATION

Next, Appellant contests the trial court's award of sole custody to the father and refusal to grant visitation. Appellant asserts that the trial court abused its discretion in the custody determination because of the father's violent nature, refusal to support the children, and his illegal acts in proffering the improperly admitted audio tapes.

The trial court relied on the case of *Suttles v. Suttles*, 748 S.W.2d 427 (Tenn. 1988) to terminate visitation between Appellant and her three children. The trial court provided that the only contact Appellant was allowed with her children was on the telephone which does not in any way constitute visitation. In *Suttles*, the court held "the combination of [the Father's] incarceration, the crime for which he is in prison, the age of the child, his history of violent behavior toward his son and [the Mother], and his obvious need to deal with his violent temper make visitation inappropriate at this time." *Suttles*, 748 S.W.2d at 423.

This Court recently visited the issue of custody and visitation when a parent was refused visitation rights in *Wix v. Wix*, No. M2000-00230-COA-R3-CV, 2001 WL 219700 (Tenn.Ct.App. Mar. 7, 2001). In *Wix*, this Court stated:

> Custody and visitation decisions are among the most sensitive decisions confronting a trial court in a divorce case. *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn.Ct.App. 1996). Rather than calling for heavy handed, authoritarian intervention, *Jones v. Jones*, No. 01A01-9607-CV-00346, 1997 WL 80029, at *4

(Tenn.Ct.App. Feb. 26, 1997) (No Tenn.R.App.P. 11 application filed), they require trial courts to exercise compassionate and practical judgment to devise an arrangement that will promote the continuation and development of the child's relationship with both parents. *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996); *Taylor v. Taylor*, 849 S.W.2d 319, 331-32 (Tenn. 1993); *Wilson v. Wilson*, 987 S.W.2d 555, 564 (Tenn.Ct.App. 1998). Trial courts must not use these decisions to reward or punish parents. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn.Ct.App. 1997); *Turner v. Turner*, 919 S.W.2d 340, 346 (Tenn.Ct.App. 1995).

The goal of custody and visitation decisions is to promote the child's best interests by placing him or her in an environment that will best serve his or her physical or emotional needs. *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983). No hard and fast rules exist for determining which custody and visitation arrangement will serve a child's needs best. *Taylor v. Taylor*, 849 S.W.2d at 327 (Tenn. 1993); *Dantzler v. Dantzler*, 665 S.W.2d 385, 387 (Tenn.Ct.App. 1983). The inquiry is factually driven and requires the courts to carefully weigh numerous considerations, including those identified in Tenn. Code Ann. § 36-6-106 (Supp. 2000). *Nichols v. Nichols*, 792 S.W.2d 713, 716 (Tenn. 1990); *Rogero v. Pitt*, 759 S.W.2d 109, 112 (Tenn. 1988); *Holloway v. Bradley*, 190 Tenn. 565, 571, 230 S.W.2d 1003, 1006 (1950).

The comparative fitness analysis is not intended to ascertain which parent has been perfect because perfection is as unattainable both in marriage and in parenting as it is in life's other activities. *Rice v. Rice*, 983 S.W.2d 680, 682-83 (Tenn.Ct.App. 1998); *Bush v. Bush*, 684 S.W.2d 89, 93 (Tenn.Ct.App. 1984). Courts understand that parents have their own unique virtues and vices. *Gaskill v. Gaskill*, 936 S.W.2d at 630. Accordingly, we do not expect parents to prove that they are exemplary or that the other parent is completely unfit. Instead, they carefully consider the conduct and circumstances of the parents to determine which of the available custodians is comparatively more fit to have permanent custody of the child. *Earls v. Earls*, 2000 WL 696816, at *6; *Gaskill v. Gaskill*, 936 S.W.2d at 631.

Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, appellate courts are reluctant to second-guess a trial court's decisions. Trial courts must be able to exercise broad discretion in these matters, but they still must base their decisions on the proof and upon the appropriate application of the applicable principles of law. *Gaskill v. Gaskill*, 936 S.W.2d at 631; *D v. K,* 917 S.W.2d 682, 685 (Tenn.Ct.App. 1995). Thus, we review these decisions de novo on the record with a presumption that the trial court's findings of fact are correct unless the evidence preponderates otherwise. *Nichols v. Nichols*, 792 S.W.2d at 716; *Doles v. Doles*, 848 S.W.2d 656, 661 (Tenn.Ct.App. 1992).

. . . .

. . . Accordingly, Tennessee's General Assembly and courts have recognized that non-custodial parents have a fundamental right to visit their children. Tenn. Code Ann. § 36-6-301 (Supp. 2000); *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988); *Helson v. Cyrus*, 989 S.W.2d 704, 707 (Tenn.Ct.App. 1998); *Jahn v. Jahn*, 93 S.W.2d 939, 941 (Tenn.Ct.App. 1996); *Weaver v. Weaver*, 37 Tenn.App. 195, 202-03, 261 S.W.2d 145, 148 (1953).

. . . .

. . . However, a parent's right to visit with his or her children is not absolute. The courts may restrict, suspend, or terminate visitation rights upon the presentation of clear and definite evidence that permitting continued visitation will jeopardize the child physically, emotionally, or morally. Tenn. Code Ann. § 36-6-301; *Suttles v. Suttles*, 748 S.W.2d at 429; *Helson v. Cyrus*, 989 S.W.2d at 707; *Weer v. Weaver*, 37 Tenn. App. at 202-03, 261 S.W.2d at 148.

Because of the legal and psychological significance of a parent's visitation rights, persons seeking to restrict or eliminate visitation must demonstrate that there is probable cause that the child will be placed at risk if visitation is permitted. The Tennessee Supreme Court requires that this proof must be "definite," *Suttles v. Suttles*, 748 S.W.2d at 429, and Tenn. Code Ann. § 36-6-301 requires that the proof demonstrate that visitation is "likely" to endanger the child's physical or emotional health. These evidentiary standards have effectively created a presumption against severely circumscribing or denying visitation to non-custodial parents. Such drastic measures are appropriate only when arrangements less detrimental to the parent-child relationship are not available or workable as a practical matter.

With these principles in mind, the courts have terminated or suspended visitation by a non-custodial parent only in extreme circumstances such as (1) the non-custodial parent's history of physically abusing his spouse and child, *Suttles v. Suttles*, 748 S.W.2d at 429; (2) the non-custodial parent's abandonment of the child; *Turner v. Turner*, 919 S.W.2d at 346; *Mimms v. Mimms*, 780 S.W.2d 739, 745 (Tenn.Ct.App. 1989); or (3) conduct of the non-custodial parent that is injurious to the child's physical health, *Smith v. Smith*, No. 03A01-9603-CV-00078, 1996 WL 591181, at *4 (Tenn.Ct.App. Oct. 11, 1996) (No. Tenn.R.App.P. 11 application filed). In other circumstances, the courts have stopped short of terminating or suspending visitation when less restrictive alternatives, such as supervised visitation, have been reasonably available. *E.g., Whitaker v. Whitaker*, 957 S.W.2d 834, 838-39 (Tenn.Ct.App. 1997) (disapproving unreasonably burdensome restrictions on visitation on a parent ordered to undergo counseling); (approving supervised visitation for a parent who permitted a child to play unattended in a parking lot);

*Pizillo v. Pizzillo*, 884 S.W.2d at 757 (approving supervised visitation for a non-custodial parent convicted of sexual abuse); (approving supervised visitation for a non-custodial parent charged with sexual abuse).

*Wix v. Wix*, No. M2000-00230-COA-R3-CV, 2001 WL 219700, at *9-11 (Tenn. Ct. App. Mar. 7, 2001).

The record in this case, developed through eight days of trial spread over a six month period, reflects that the trial judge was faced with an analysis of comparative unfitness rather than comparative fitness. He chose the least objectionable of his alternatives and the evidence does not preponderate against that choice. Weighing strongly against Mrs. Johnson is not her lack of love for her children, deficiencies as a homemaker, or her attention to the physical needs of her children. The record, however, is replete with incidents of her seemingly uncontrollable temper reflected in confrontations with the children's teachers and coaches in which she expresses her complaints with sexually explicit profanity in the presence of her own children and other children. Likewise, while the court's orders prohibiting her relationship with Carl Harbison are probably unenforceable when limited to a one to one relationship in the absence of the children, it certainly is a factor in any fitness analysis. Of more significance is her repeated relationship with Carl Harbison in the presence of her children.

Mrs. Johnson testified on December 15, 1999:

Q.      Slept in the bed with him there?
A.      Yes, sir.
Q.      When your children were there?
A.      My children have never seen us sleeping together. I will promise you that.
Q.      Did you sleep in the bed?
A.      I answered that question.
Q.      With Carl Harbison when your children were present in the house?
A.      I have slept with Carl but my children have never seen me sleeping with Carl.
Q.      When the children were there did you get in the bed with him?
A.      Yes, sir, but they still never saw it.
Q.      Where did they sleep?
A.      They slept on the couch or on pallets or in beds.

The above was not an isolated incident but a continuing pattern which included a four day vacation to Florida during which she slept with Mr. Harbison. She testified:

Q.      You weren't there for your court appearance, were you?
A.      No, sir, I wasn't.
Q.      Tell the Court where you were.
A.      I took my kids on vacation to Florida. They have had the roughest year of their life and they've always had a vacation. School was getting ready to start and

-14-

Jim was trying to have it put off, and the DA - -

Q. You knew the case was set that day?
A. Yes, sir, but Kevin had plenty of dates postponed on me before.
Q. Tell the Court who you went with.
A. Me and the kids and Carl and Jonathan.
Q. And Carl and Jonathan stayed at a motel in Panama City Florida Days Inn?
A. Yes, sir, we did.
Q. And you and Carl slept where?
A. We had two rooms.
Q. Where did you sleep?
A. Everybody switched up overnight. No particular place.
Q. You didn't sleep in the room with Mr. Harbison?
A. I may have one night. I'm not sure. We had kids laying everywhere.
Q. With children in the room?
A. And I slept in with the kids.

This Court has held:

Absent some compelling reason otherwise, considerable weight must be given to the judgment of a trial court in a divorce proceeding in respect to the credibility of the parties and their suitability as custodians. *Bush v. Bush*, Tenn.App. 1984, 684 S.W.2d 89.

The trial courts are vested with a wide discretion in matters of child custody, and the reviewing courts will not interfere except upon a showing of erroneous exercise of that discretion. *Grant v. Grant*, 39 Tenn.App. 539, 286 S.W.2d 349 (1956).

*Mimms v. Mimms*, 780 S.W.2d 739, 744-45 (Tenn.Ct.App. 1989).

The trial court did not abuse its discretion in awarding custody of the minor children to Mr. Kevin Johnson.

The refusal of the trial court to grant any form of visitation to Mrs. Johnson with her children is in error for the same reasons set forth in *Wix*. There is no evidence in the record that the appellant's behavior put the children in danger of physical abuse, or that the appellant has abandoned her children, or has injured their health.

The action of the court denying visitation to Mrs. Johnson is reversed and on remand, a reasonable visitation schedule will be established for Mrs. Johnson, conditioned as the trial court may deem appropriate.

THE CRIMINAL CONTEMPT

In the final judgment and decree of divorce entered January 20, 2000, the trial court held, in part:

This matter came on to be heard on the 6th day of January, 2000 as well as the previous dates of July 26th, 28th, 29th, and 30th, 1999, December 15th, 16th, and 17th, 1999, before the Honorable Russ Heldman, Judge, holding the Chancery Court of Williamson County, Tennessee, in the continuing trial of this cause and hearing on the Petition For Contempt filed on behalf of Plaintiff, and upon testimony of witnesses, statement of counsel, and the entire record of this cause the Court having heard proof finds that Defendant's violations of the Orders of this Court are not justifiable; that the Petition for Contempt filed on behalf of Plaintiff is proper and the contemptuous violations of Defendant are criminal not civil; that in having heard proof beyond a reasonable doubt the Court finds Defendant committed thirty-three (33) separate violations of the Orders of this Court (i.e. Agreed Order entered April 28th, 1999; Agreed Order entered June 22nd, 1999; and, Order entered December 17th, 1999) every other weekend since June of 1999 with respect to having contact or been with Carl Harbison (i.e. twelve (12) weekends x 2 days per weekend= twenty-four (24) violations; four (4) days in Florida trip; three (3) occasions since Order of December 7th, 1999; one (1) dinner with Carl Harbison after entry of Agreed Order of June 22nd, 1999; and, one (1) telephone conversation with Carl Harbison for clearly at least thirty-three (33) violations); but since the Court is running the violations of Defendant with the children concurrent with the separate violations of the Defendant herself, the Court did not make a determination as to the number of violations by Defendant with respect to the minor children of the parties having contact with Carl Harbison; that because of Defendant's willful, gross and flagrant violations of the Orders of this Court and in an effort to protect the integrity of the judicial system as well as to enforce these Orders of this Court, the Court sentences Defendant to ten (10) days in the Williamson County Jail for each violation, which makes a total of 330 days of incarceration in the Williamson County Jail, and sets Defendant's bond at $33,000.00 and hereby orders Defendant to be taken immediately into custody and taken to jail by the Williamson County Sheriff's Department upon the Court's conclusion in adjudicating the divorce issues of this case.

Kevin Julian Johnson had filed a Petition for Contempt against Donna Cole Johnson on August 26, 1999. In this Petition for Contempt, it is asserted:

2.      That on April 28th, 1999 an Agreed Order was entered in this cause, said Agreed Order is adopted herein by reference as though fully and specifically set out. The Agreed Order provided, among other things, that Wife agrees to terminate all contact with Carl Harbison pending the final hearing of this cause.

3. That on June 22nd, 1999 an Order was entered in this cause, said Order is adopted herein by reference as though fully and specifically set out. The Order provided, among other things, that each party keep the minor children of the parties in the marital home of the parties for a week at a time; that Defendant/Wife shall remain in the marital home until 6:00 p.m. on Sunday, June 20th, 1999, at which time the Defendant/Wife shall leave the home and Plaintiff/Husband shall move back into the marital home and remain until 6:00 p.m. on Sunday, June 27th, 1999; that the parties shall alternate living in the marital home every other week thereafter until the final hearing in this cause; and, that Defendant/Wife is enjoined and restrained from any contact with Carl Harbison or with keeping the children of the parties and the children of Carl Harbison together.

4. Plaintiff alleges on the first night after the Agreed Order was entered into by the parties in open Court the Defendant, Mrs. Johnson, and Carl Harbison went to dinner together which was a flagrant disregard and contempt of the Agreed Order.

5. Plaintiff states Defendant has violated the Order of the Court entered on June 22nd, 1999 on an almost daily basis as she has continued her adulterous relationship with Carl Harbison as well as having the parties' minor children and Carl Harbison's child, Johnathan, together. On numerous occasions, Defendant has had the parties' minor children at the home of Carl Harbison. On numerous occasions, Defendant and the parties' minor children have stayed overnight at the home of Mr. Harbison with Defendant sleeping in the same bed with Mr. Harbison and the parties' minor children sleeping on the floor. As testified to by Carl Harbison in open Court, Defendant and the parties' minor children even spent the night before the final hearing in this cause at the home of Mr. Harbison with Defendant sleeping in the same bed with Mr. Harbison and the children sleeping on the floor.

6. Further, Plaintiff states Defendant and the parties' minor children went to Florida with Carl Harbison and Mr. Harbison's child, Johnathan, from August 9th, 1999 through August 12th, 1999 and then they spent the night at the home of Carl Harbison on August 13th and 14th, 1999.

7. Plaintiff states Defendant's flagrant disregard and contempt of the Court's orders in continuing her adulterous relationship with Carl Harbison and allowing the parties' minor children and the children of Carl Harbison to be together is an act of willful contempt of this Court.

PREMISES CONSIDERED, PLAINTIFF PRAYS:

1. That proper process issue and be served on the Defendant, Donna

Cole Johnson, by and through her counsel, James L. Curtis, causing Defendant to answer this Petition for Contempt.

2.     That at the hearing of this cause, Defendant be found in contempt of this Court and punished accordingly.

3.     That the Defendant be required to pay all attorney's fees and court costs in this cause.

4.     For such other, further and general relief as to which the Plaintiff may be entitled.

At the hearing of December 15, 1999, the following occurred:

THE COURT: You made me aware.  I'm going to rule on the contempt petition Mr. Johnson has filed based on the evidence and of course give Mrs. Johnson wide latitude to defend against it.  Is there going to be any proof from Mrs. Johnson that is not before the Court in the divorce case?
MR. CURTIS: I don't know.  I have answered it.  I don't know what other facts they are going to put forward.
THE COURT: Then - -
MR. YOUNG: From the petitioner's point of view it will be the same proof that is going to come out as a result of the divorce case.
THE COURT: We will make a determination adjudication of Mr. Johnson's contempt petition during these proceedings as anticipated . . . .

The record shows without doubt that Mrs. Johnson repeatedly violated the orders of the court, much in the manner charged in the August 26, 1999 Petition for Contempt.

The convictions of Mrs. Johnson for criminal contempt cannot stand.  The very first time that criminal contempt is mentioned is in the Final Judgment and Decree of Divorce entered on January 20, 2000 where the court determines Mrs. Johnson to be guilty of criminal contempt.  No effort is made to comply with Rule 42(b) of the Tennessee Rules of Criminal Procedure and such failure is fatal to a conviction for criminal contempt.  This Court has held:

Because the contempt was criminal in nature, the husband was entitled to all the constitutional protections of any criminal defendant, including "the presumption of innocence and the right to require guilt to be shown beyond a reasonable doubt," *id.* (citing *Strunk v. Lewis Coal Co.*, 547 S.W.2d 252, 253 (Tenn.Crim.App. 1976), the right not to incriminate himself, and notice. *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 444-46, 31 S.Ct. 492, 499-500, 55 L.Ed. 797, 807-08 (1911).

The husband has challenged the trial court's findings of criminal contempt on the grounds that the contempt petition did not provide notice that the husband was being charged with criminal contempt and that the petitioner failed to prove the husband's contempt beyond a reasonable doubt.

With regard to notice, the United States Supreme Court stated in *Gompers* that manifestly every citizen, however unlearned in the law, by mere inspection of the papers in contempt proceedings ought to be able to see whether it was instituted for private litigation or for public prosecution, whether it sought to benefit the complainant or vindicate the court's authority. He should not be left in doubt as to whether relief or punishment was the object in view. He is not only entitled to be informed of the nature of the charge against him, but to know that it is a charge and not a suit. *Id.* at 446, 31 S.Ct. at 500, 55 L.Ed. at 807-08.

In addition, Rule 42(b) of the Tennessee Rules of Criminal Procedure requires that a criminal contempt be prosecuted on notice, which "shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and *describe it as such*." Tenn.R.Crim.Proc. 42(b) (emphasis added).

Our review of the record indicates that none of the contempt petitions against the husband designated the contempt as criminal. Apparently, the nature of the contempt did not become known to the parties until the trial court entered its memorandum opinion sentencing the husband to a set time in the county workhouse and providing no opportunity for the contemnor to purge himself.

Because the husband was not afforded proper notice as required by the Tennessee Rules of Criminal Procedure and *Gompers, supra*, we find it necessary to reverse that part of the trial court's order sentencing the husband to two 10-day periods in the county workhouse.

*Storey v. Storey*, 835 S.W.2d 593, 599-600 (Tenn. Ct. App. 1992) (internal footnotes omitted).

The action of the trial court finding Mrs. Johnson in criminal contempt is reversed and the sentences imposed upon her are vacated.

The final issue on appeal relative to alleged forgery of checks was abandoned in argument by the appellant.

CONCLUSION

The judgment of the trial court awarding custody of the children to Kevin Johnson is

-19-

affirmed.  The judgment of the trial court denying visitation to Mrs. Johnson is reversed.  The judgment of the trial court finding Mrs. Johnson guilty of criminal contempt is reversed and all sentences imposed are vacated.  The case is remanded to the trial court with instructions to set reasonable and meaningful visitation rights for Mrs. Johnson, subject to such conditions as the trial court may deem appropriate.

Costs of appeal are assessed equally to the parties.

_____
WILLIAM B. CAIN, JUDGE